CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

PARK PLACE ENTERTAINMENT CORP., Defendant.

No. 00 CIV.8660(CM)(GAY).

United States District Court, S.D. New York.

Feb. 20, 2002.

---

Thomas P. Puccio, Thomas P. Puccio, Herbert F. Kozlov, Reed Smith LLP, New York City, John P. Gallagher, Stites & Harbison, Atlanta, GA, Bethany A. Breetz, Stites & Harbison, Louisville, KY, Herbert F. Kozlov, Parker, Duryee, Rosoff & Haft, New York City, William W. Hopson, J.D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, for plaintiffs.

David Boies, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for defendant.

## MEMORANDUM DECISION AND ORDER

MCMAHON, District Judge.

Plaintiffs Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C. ("Mohawk") and Monticello Raceway Development Co., L.L.C. ("Monticello") (collectively, "Catskill" or "plaintiffs"), bring this action in diversity against Park Place Entertainment Corp. ("Park Place"), claiming tortious interference with contractual relations and interference with prospective business relationships. Plaintiffs allege that defendant, one of the world's largest casino companies, wrongfully induced officials of the St. Regis Mohawk Tribe (the "Tribe") to terminate the Tribe's contractual agreement and business relationships with plaintiffs relating to the development and management of a proposed $500 million Native American casino at the Monticello Raceway in Sullivan County, New York (the "Casino Project").

The issue before me is plaintiffs' Objections to Magistrate Judge Yanthis' two December 28, 2001 discovery Orders quashing six (6) subpoenas issued by Catskill against three individual members of the Tribe, two attorneys associated with the Tribe, and the bank in which the Tribe has an account. The Motions to Quash are grounded in tribal sovereign immunity. Plaintiffs also objected

to two other discovery orders issued on January 15, 2002 and January 17, 2002.

I conclude that Judge Yanthis erred in quashing the subpoenas addressed to two of the three individual tribal members [Ransom and Smoke], and I overturn his order to that effect. I also direct Attorney Waterman to respond in writing to a specific question. I otherwise affirm Judge Yanthis' Orders. The Tribe's oral motion for question certification is denied.

## I. FACTUAL BACKGROUND

### A. The Underlying Action

Casino gambling is illegal in New York State. However, a federal statute, the Indian Gaming Regulatory Act ("Gaming Act" or "IGRA"), 25 U.S.C. § 2701—2721 (1988), permits different types of gaming, including casino gambling, on Native American land under specified conditions.

The act classifies gaming activities into three different categories. Tribes have exclusive jurisdiction over Class I gaming, which includes social games and traditional forms of Indian gaming connected to tribal ceremonies. 25 U.S.C. §§ 2703(6), 2719(a)(1). Class II gaming, defined by the Gaming Act to include "the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) . . . including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo . . .," are regulated by the National Indian Gaming Commission (NIGC).[1] All other gaming activity (including both electronic gaming devices and traditional casino games, such as card tables, craps, roulette, and slot machines) is Class III gaming.

The Gaming Act permits Native American tribes to petition the Governor of their host state for a so-called "compact" that would allow Class III gaming on reservation lands and/or on lands to be acquired and held in trust by the United States Government for the benefit of the tribe. 25 U.S.C. § 2710(d)(3). These compacts define which types of Class III gaming activities the Tribes can conduct, and usually provide that a portion of the gaming revenues will go to the State. (Compl. at 26–28.) Any compact between the state and the Tribe must be approved by the Secretary of the Interior. § 2710(d)(3)(B).

In 1995, leaders of the Mohawk tribe opened discussions with Sullivan County businessmen who were looking to develop a gambling facility, using the Monticello Raceway in Monticello, New York, as a cornerstone for the operation. In October 1995, these businessmen formed Catskill to pursue the Casino Project and seek federal approval for the plan. (Compl. at ¶ 33–37.)

■ Catskill bought the Monticello Raceway in 1996 for $10 million, and set aside approximately 30 acres of that property for the casino. The plan was to transfer these 30 acres to the U.S. Government to be held in trust for the Tribe, in exchange for which the Tribe would pay plaintiff Catskill Development $10 million in cash. This aspect of the project was set out in an amended and restated Land Purchase Agreement (hereinafter the "LPA"), executed between the plaintiff Catskill Development and the St. Regis Mohawk Gaming Authority (the "Gaming Authority"). The Gaming Authority is described as an "instrumentality" of the Tribe. See LPA, § 5.01. The LPA was signed on behalf of the Gaming Authority by Hilda Smoke, Alma Ransom and Paul Thompson as Board Members of the Gaming Authority. The LPA provided for a waiver of the Gaming Authority's sovereign immunity, as follows:

The Purchaser[2] does hereby consent to the enforcement and execution of any judgment, whether obtained as a result of

---

1. Class I and II gaming activities are not at issue in the present case.

2. The LPA "Purchaser" is the St. Regis Mohawk Gaming Authority (the "Gaming Authority"), an instrumentality of the Tribe, not the Tribe itself. The Gaming Authority, however, as a branch of the tribe, does share its sovereign immunity. See, e.g., Ninigret Devel. Corp. v. Narragansett Indian Wetuomuck Housing Auth., 207 F.3d 21, 29 (1st Cir.2000); Worrall v. Mashantucket Pequot Gaming Enterprise, 131 F.Supp.2d 328, 329 (D.Conn.2001).

judicial, administrative, or arbitrational proceedings, against any assets of the Purchaser. Subject to the foregoing, the Purchaser does *hereby waive its sovereign immunity from unconsented suit,* whether such suit be brought in law or in equity, or in an administrative proceedings or proceedings in arbitration, to permit the commencement, maintenance and enforcement of any action, by any person with standing to maintain an action, *to interpret and enforce the terms of this Agreement....* Notwithstanding any other provision of law or canon of construction, *the Purchaser intends this waiver to be interpreted liberally to permit the full litigation of disputes arising under or out of this Agreement.*

LPA, § 14.10

Other allegedly relevant sections of the LPA are Sections 12.01 and 14.07, which the Tribe invokes as limitations on the waiver of sovereign immunity in § 14.10. Section 12.01 provides:

> If Seller[3] shall have performed all of its obligations under this Agreement and all conditions to Purchaser's obligation to proceed with the Closing shall have been satisfied or waived, and if Purchaser shall (a) fail or refuse to close as required by the terms of this Agreement, or (b) otherwise be in default hereunder, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, and would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, *Seller's sole remedy shall be to seek specific enforcement by Purchaser of its obligations under this Agreement.*

LPA § 12.01 (emphasis added). Section 14.07 provides:

**3.** "Seller" is Catskill Development, L.L.C., plaintiff in this action.

**4.** When the Tribe entered into its agreement with Park Place, the Tribe had split into two factions, and was engaged in internal litigation concerning tribal governance and the existence of the Tribe's "Three Chiefs" system of leadership. For the background of the current divisions within the St. Regis Mohawk Tribe as they relate to the tribal court suit brought by the former Mohawk

Neither the Tribe, nor any officer, office holder, agent, representative employee, member of the Purchaser or the Tribe, as such, *shall have any personal liability* for the obligations of the Purchaser under this Agreement or, for any claim based on, in respect of, or by reason of, such obligations or their creation.

LPA § 14.07 (emphasis added).

Several collateral agreements were entered into by the Tribe or by the Gaming Authority and plaintiffs. The agreements collectively provided for the construction of the various gaming facilities, and described the rights of each party in the management of the facilities.

The casino project was subject to extensive federal and state regulatory oversight under the Indian Gaming Regulatory Act (IGRA), codified at 25 U.S.C. § 2701 et seq. An analysis of the statutes and procedures involved in acquiring such approvals is outlined in this Court's May 14, 2001 decision, *Catskill Development LLC v. Park Place Ent. Corp.,* 144 F.Supp.2d 215, 221–24 (S.D.N.Y. 2001), *vacated in part on reconsideration,* 154 F.Supp.2d 696 (S.D.N.Y.2001).

In April 2001, the Tribe abrogated its business relationship with Catskill and entered into a written casino development agreement with Park Place, a public company that owns twenty-eight casinos in various states and countries. At the time the Tribe (or at least one faction of it)[4] contracted with Park Place, plaintiffs' project had received some, but not all, of the governmental approvals. *See Catskill Development,* 154 F.Supp.2d at 700.

Plaintiffs commenced this action for tortious interference with contracts, tortious interference with prospective business relations, unfair competition, and violations of

chiefs and other tribal members against the current tribal chiefs and Park Place, see *Park Place Entertainment v. Arquette,* 113 F.Supp.2d 322 (N.D.N.Y.2000) (finding that the federal district court lacked subject matter jurisdiction to enjoin a tribal court proceeding), and *Arquette v. Park Place Entertainment Corp.,* Case No. 00C10133GN, Mar. 20, 2001 (St. Regis Mohawk Tribal Court, Hogansberg, NY).

New York's Donnelly Act. Defendants moved to dismiss the complaint. This Court dismissed plaintiffs' claims for unfair competition and violations of the Donnelly Act, but declined to dismiss plaintiffs' claims for tortious interference with prospective business relations and tortious interference with the LPA. *Catskill Development,* 144 F.Supp.2d 215 (S.D.N.Y.2001), *vacated in part on reconsideration,* 154 F.Supp.2d 696 (S.D.N.Y. 2001). Discovery has been ongoing since last Spring under the supervision of Magistrate Judge Yanthis of this District.

## B. The Present Dispute

### 1. The Ransom, Smoke and McDonald Subpoenas

On or about July 3, 2001, plaintiffs subpoenaed two members of the Tribe, Hilda Smoke and Alma Ransom, the signers of the LPA, to give deposition testimony. Plaintiffs also subpoenaed the Tribe's Executive Director, Angus McDonald.

The Mses. Smoke and Ransom are, according to one tribal faction, Chiefs of the Tribe. When they took the position that they were immune from process as a matter of sovereign immunity, the Magistrate Judge directed the Tribe to file a motion to quash by August 10, 2001. They did so.

■ In its Motion for a Protective Order, the Tribe argued that the three subpoenas should be quashed because (1) tribal sovereign immunity prevented plaintiffs from obtaining the requested discovery, and that sovereign immunity was never waived by the Tribe, and (2) plaintiffs never personally served Ransom, Smoke and McDonald[5]. Plaintiffs argued that the Tribe's sovereign immunity did not protect the officials from testifying as non-party fact witnesses, and, in

any case, argued that the Tribe clearly and expressly waived sovereign immunity in the LPA.

On December 28, 2001, the Magistrate Judge granted the Tribe's motion, finding that "sovereign immunity bars enforcement of the subpoenas in question, absent the tribe's waiver," and that "interpreting the[ ] waiver provisions narrowly ... the LPA immunity waiver is limited to actions against the St. Regis Mohawk Gaming Authority brought to interpret or enforce terms of the LPA itself," and thus, "the Tribe has not waived its sovereign immunity which shields it from enforcement of the subpoenas in question." *See* Memorandum, Decision and Order Granting the Tribe's Motion to Quash the Smoke, Ransom, McDonald, Walker and Waterman Subpoenas ("Tribe Quash Order").

On or about January 17, 2002, plaintiffs timely appealed to the Magistrate Judge's Orders. Plaintiffs raised the following Objections to the Tribe Quash Order as it applied to Ransom, Smoke and McDonald: (1)(a) Ransom, Smoke and McDonald may not raise sovereign immunity for unofficial factual matters, such as subpoenaed testimony about conversations with non-tribal members and events; and, (b) they may not use tribal immunity as a shield for unlawful and unauthorized activity; and, (2) the Magistrate Judge erroneously held that the Tribe did not waive immunity in the LPA.

### 2. The Waterman and Walker Subpoenas

On or about July 3, 2001, the same day Ransom, Smoke and McDonald were subpoenaed, plaintiffs served deposition subpoenas on Bradley S. Waterman and Hans Walker, Jr., counsel for the Tribe. The subpoenas

---

5. The Magistrate Judge did not address the issue of proper service of the subpoenas. In any case, this Court finds that the method of service on the tribal officials—substitute service at the Tribe's offices followed by mailing properly labeled copies to the same address—was sufficient under Federal Rules of Civil Procedure, Rule 45. *See King v. Crown Plastering Corp.,* 170 F.R.D. 355, 356 (E.D.N.Y.1997) (Service by substituted service on a person of "suitable age and discretion" at residence, followed by mailing, held to be sufficient under Rule 45). *See also* N.Y.C.P.L.R.

§ 308 ("Personal service upon a natural person shall be made ... by delivering the summons within the state to a person of suitable age and discretion at the actual place of business ... and by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend 'personal and confidential' and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.")

also commanded the attorneys "to produce or permit inspection and copying of a list of documents" attached to the subpoenas. The list of non-privileged documents requested included "all documents concerning communications by and/or between you (and/or the Mohawks) and Park Place concerning Plaintiffs' application to develop and manage the Casino Project," and "all desk calendars, diaries, daily logs, memoranda and reports which were maintained and/or prepared by or on behalf of you concerning (i) the Casino Project; (ii) the Plaintiffs; (iii) communications with any state or federal government officials identified [above]; (iv) the Mohawks; (v) communications with any persons or entities identified [above]; (vi) efforts or actions by Park Place to establish its own gaming casino in the State of New York and/or in the Catskills region in particular; (viii) any loans made by Park Place to the Mohawks; (ix) the Akwesasne Mohawk Casino; (x) the Monticello Raceway; and (xi) the Kutsher's Country Club." *See* Addendum to Walker and Waterman Subpoenas.

The Tribe also moved to quash these subpoenas, arguing that the attorneys were protected by sovereign immunity. Plaintiffs argued that the attorneys do not, *ipso facto,* possess sovereign immunity. They argued that in order to possess the Tribe's immunity, the attorneys must demonstrate (1) that they are members of the Tribe; (2) that the actions about which plaintiffs seek discovery were undertaken in their official capacity as Tribe officials; and (3) that the actions were within the scope of their authority. They contend that movants made no such showing.

In his December 28, 2002 Tribe Quash Order, the Magistrate Judge stated:

> Plaintiffs do not dispute that the subpoenas served upon Mr. Walker Jr. and Mr. Waterman were directed at procuring information about the Tribe's business and the attorney's work on behalf of the Tribe. Neither do plaintiffs contend that Mr. Walker, Jr. and Mr. Waterman were acting outside the scope of their authority. Accordingly, the Tribe's sovereign immunity extends to Mr. Walker, Jr. and Mr.

Waterman. *See Wallett v. Anderson,* 198 F.R.D. 20, 24 (D.Conn.2000).

*See* Tribe Quash Order, at 2 n. 2.

In their timely appeal, plaintiffs argued that the Magistrate Judge erroneously extended tribal sovereign immunity to Walker and Waterman. Specifically, plaintiffs argue that the Magistrate Judge erroneously accepted the Tribe's statement that Walker and Waterman are the "Tribe's counsel," that the Magistrate Judge erroneously held that "plaintiffs do not dispute that the subpoenas served upon [Walker and Waterman] were directed at procuring information about the Tribe's business and the attorneys work on behalf of the Tribe," and that the Magistrate Judge misapplied the standard for subjecting Tribal officials to judicial process.

### 3. The Key Bank Subpoena

On or about December 4, 2001, plaintiffs served a subpoena duces tecum on Key Bank, N.A., in Massena, New York. The subpoena commanded the production of "Monthly bank statements, including check and deposit slips, whether personal and/or commercial, opened and/or maintained by the Mohawks." The Tribe objected to the subpoena by letter on December 10, 2001, arguing that the Tribe's sovereign immunity shielded the bank from producing the subpoenaed documents.

In a separate Memorandum, Decision and Order issued on December 28, 2001 (the "Key Bank Quash Order"), the Magistrate Judge quashed the Key Bank subpoena. Relying on his ruling of sovereign immunity in the Tribe Quash Order, the Court found that "if the plaintiffs subpoenaed *the Tribe* demanding that it produce these bank documents, the Tribe's sovereign immunity would prevent enforcement of the subpoena," and so "the outcome does not change simply because the subpoenaed documents are held by a third party and not by the Tribe itself." *See* Key Bank Quash Order at 2.

In their timely appeal, plaintiffs argued that the Magistrate Judge (a) erroneously granted the Tribe standing to object to the Key Bank subpoena; and, (b) the Magistrate Judge erroneously extended the sovereign

immunity doctrine to quash the Key Bank subpoena.

## II. DISCUSSION

### A. Standard

 A District Court reviewing a Magistrate Judge's non-dispositive pretrial orders, such as discovery orders, may modify or set aside any part of that order if it is clearly erroneous or contrary to the law. Fed.R.Civ.P. 72(a); *see also Sheikhan v. Lenox Hill Hospital*, 98 Civ. 6468, 1999 WL 386714, *1 (S.D.N.Y. June 11, 1999) (Rule 72(a) standard applies to discovery orders). Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *See e.g., Mathias v. Jacobs*, 167 F.Supp.2d 606, 622 (S.D.N.Y.2001). An order may be deemed contrary to law "when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 74 (N.D.N.Y.2000). The party seeking to overturn a magistrate judge's decision carries a heavy burden. *Citicorp v. Interbank Card Ass'n*, 87 F.R.D. 43, 46 (S.D.N.Y.1980).

A party is entitled to discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R.Civ.P. 26(b)(1).

### B. The Ransom, Smoke and McDonald Subpoenas

1. *Tribal sovereign immunity applies to non-party subpoenas in civil litigation*

 Plaintiffs argue that the Magistrate Judge erred by finding that sovereign immunity applied to non-party subpoenas in civil litigation. The Tribe argues that sovereign immunity does protect tribes against the enforcement of such non-party civil subpoenas. Judge Yanthis did not err in thus finding.

 The doctrine of tribal immunity from suit is well established. *See Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (reaffirming that an Indian tribe is not subject to suit in a state court unless "Congress has authorized the suit or the tribe has waived immunity"). It is equally well-settled that tribal sovereign immunity does not extend to individual members of a tribe. *Puyallup Tribe, Inc. v. Dep't of Game of State of Washington*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Romanella v. Hayward*, 933 F.Supp. 163, 167–68 (D.Conn.1996). Tribal immunity does extend, however, to tribal officials when acting in their official capacity and within their scope of authority.[6] *Davis v. Littell*, 398 F.2d 83, 84–85 (9th Cir.1968), *cert. denied.* 393 U.S. 1018, 89 S.Ct. 621, 21 L.Ed.2d 562 (1969); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 862 F.Supp. 995, 1002 (W.D.N.Y.1994).

The extent to which tribal sovereign immunity applies to non-party subpoenas of individuals in civil litigation is not clearly established in this Circuit, and there is little authority anywhere on whether a Native American tribe may be compelled to testify or produce documents as non-party fact witnesses pursuant to the district courts' subpoena power. The Magistrate Judge relied on a Ninth Circuit case, *United States v. James*, 980 F.2d 1314 (9th Cir.1992), *cert. denied*, 510 U.S. 838, 114 S.Ct. 119, 126 L.Ed.2d 84 (1993), to assert that immunity should apply automatically to defeat subpoenas, absent the Tribe's waiver. A week after the Magistrate Judge's Order, the Ninth Circuit affirmed the *James* holding in *Bishop Paiute Tribe v. County of Inyo*, 275 F.3d 893 (9th Cir.2002). *See also* William C. Canby, Jr., *American Indian Law* 87 (3d ed. 1998) ("Sovereign immunity also protects the

---

6. The continued existence of the "Three Chiefs" system of governance for the Tribe—and thus whether Smoke and Ransom are actually officials of the St. Regis Mohawk Tribe—is a dispute on which this Court expresses no opinion. For purposes of this motion I will assume that Ransom and Smoke are officials of the Tribe. I note, however, that the Tribal Court ruling currently being appealed by Park Place found that the

chiefs are not the leaders of the Tribe, and therefore may not be officials of the Tribe. *See Arquette v. Park Place Entm't Corp.*, Case No. 00C10133GN, Mar. 20, 2001 (St. Regis Mohawk Tribal Court, Hogansberg, NY). Were this ruling to be upheld, Ransom and Smoke could not invoke sovereign immunity on the basis that, as chiefs of the Tribe, they were tribal officials.

tribes against enforcement of subpoenas.") (citing *James*, 980 F.2d at 1319–20).

*James* involved an Indian defendant convicted of rape on the Quinault Indian Reservation in Washington State. Prior to trial, Mr. James attempted to subpoena documents concerning the victim's alleged alcohol and drug problems that were in the possession of the Quinault Indian Nation Department of Social and Health Services. 980 F.2d at 1319. The U.S. District Court for the Western District of Washington quashed the subpoena based on tribal sovereign immunity. *Id.*

On appeal, Mr. James claimed that the tribe's immunity did not protect it from complying with a federal district court subpoena. He also argued that the tribe's voluntary release of certain Tribal Housing Authority documents constituted a waiver of sovereign immunity as to the Department of Social and Health Services documents. The Ninth Circuit responded that "By making Indians subject to federal prosecution for certain crimes, Congress did not address implicitly, much less explicitly, the amenability of the tribes to the processes of the court in which the prosecution is commenced." *James*, 980 F.2d at 1319. Hence, the court concluded that the tribe "was possessed of tribal immunity at the time the subpoena was served, unless immunity had been waived." *Id.* The Ninth Circuit found there to have been no waiver by the Department of Social and Health Services, and held that the district court had correctly quashed the subpoena. *Id.*

In *Bishop Paiute Tribe,* the tribe and a tribally-chartered gaming corporation brought an action against the County of Inyo, the county district attorney and the county sheriff for declaratory and injunctive relief and for damages under 42 U.S.C. § 1983. The tribe's claims arose out of the execution of a warrant to search tribal employee records as part of a welfare fraud investigation. The Ninth Circuit held that the tribe was possessed of sovereign immunity which barred the county's execution of a warrant to search tribal employee records on the reservation. *Id.,* 275 F.3d at 902–04 (citing *James* as authority).

While this Circuit has not addressed the issue of non-party subpoenas and sovereign immunity in the tribal context, it has held that the sovereign immunity of the United States government applied to non-party subpoenas in a civil case. *United States Environmental Protection Agency v. General Elec. Co.,* 197 F.3d 592, 597 (2d Cir.1999), *vacated in part on other grounds,* 212 F.3d 689 (2000).

In *General Electric,* a third party subpoena duces tecum was addressed to an individual in the office of the EPA Regional Counsel in New York City. *General Electric,* 197 F.3d at 593. The EPA refused to honor the subpoena, General Electric brought a proceeding in this district to compel compliance, and the EPA cross-moved to quash the subpoena. *Id.* In granting the cross-motion and denying the motion, the district court determined that the EPA is protected from subpoenas by sovereign immunity as an agency of the United States, absent the government's waiver. *Id.* Specifically, the district court observed that:

> A proceeding is "against the sovereign" in this sense if, among other things, the result could serve " 'to restrain the Government from acting, or to compel it to act.' " *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted). Since enforcement of the instant subpoena would compel EPA to act, such enforcement is therefore barred by sovereign immunity absent an express waiver. *See Boron Oil Co. v. Downie,* 873 F.2d 67, 71 (4th Cir.1989).

*Id.* at 595 (quoting *Grand St. Artists v. General Elec. Co.,* 22 F.Supp.2d 299, 300 (S.D.N.Y.1998))

The Second Circuit agreed with the district court's reasoning, and held that "the enforcement of this subpoena duces tecum issued by General Electric to the EPA would compel the EPA to act and therefore is barred by sovereign immunity in the absence of a waiver." *General Electric,* 197 F.3d at 597.

The same rule should apply here, since "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign pow-

ers," such as the United States. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *see also United States v. United States Fidelity and Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Bishop Paiute Tribe,* 275 F.3d at 904, n. 3 (noting that "comparison to cases denying enforcement of state court subpoenas against the United States government is ... appropriate"); *California v. Quechan Tribe of Indians,* 595 F.2d 1153, 1155 (9th Cir.1979) (noting that the "sovereign immunity of Indian tribes is similar to the sovereign immunity of the United States"); *Sekaquaptewa v. MacDonald,* 591 F.2d 1289, 1291 (9th Cir.1979) ("The sovereign immunity of Indian tribes is coextensive with that of the United States.")

In support of their position that tribal sovereign immunity does not automatically apply to civil subpoenas, plaintiffs rely on two district court grand jury subpoena cases, a district court criminal subpoena case and four circuit court cases involving administrative law. These cases, however, are not on point.

In *In re Application to Quash Grand Jury Subpoenas,* Misc. No. 3774 (N.D.N.Y.1997) and *United States v. Boggs,* 493 F.Supp. 1050 (D.Mont.1980), Indian tribes unsuccessfully attempted to quash federal grand jury subpoenas seeking evidence of potential criminal wrongdoing on Indian land. Both of these cases are easily distinguishable. In *In re Application to Quash Grand Jury Subpoenas,* the St. Regis Mohawk Tribe was subpoenaed *by the Federal Government* in order to investigate potential *criminal conduct.* Unlike in *James,* where an individual defendant sought to subpoena information, the particular federal statutes involved in the case, 18 U.S.C. §§ 1154, 1156 and 1161, refer to specific violations that could not be prosecuted without a limited waiver of the tribe's immunity. *Id.* at 5. The same is true of *United States v. Boggs,* where the district court—while recognizing the basic principle that a waiver of sovereign immunity will not lightly be implied—noted that without such a waiver, the criminal laws at issue would be virtually unenforceable. *Boggs,* 493 F.Supp. at 1054. The court in *In re Application to Quash Grand Jury Subpoenas* explicitly noted that "*Boggs* can thus be considered consistent with *James and* consistent with allowing the Government access to tribal records regarding compliance with State and tribal liquor laws." *Id.* at 6 (emphasis added).

█ Plaintiffs also cite *United States v. Velarde,* 40 F.Supp.2d 1314 (D.N.M.1999), *remanded,* 214 F.3d 1204 (10th Cir.2000), in which an Indian tribe moved to quash subpoenas issued by both the defendant and the federal prosecution. The Judge rejected the *James* approach in favor of a "balancing analysis" that weighs "the Court's interests in seeing that federal law is enforced" and "the Defendant's constitutional rights" versus "any residual sovereign immunity that the Tribe might enjoy after the enactment of the Major Crimes Act." *Id.* at 1317. *Velarde* is distinguishable from *James,* in that the federal government itself subpoenaed the tribe. A tribe cannot assert sovereign immunity against the United States. *Id.,* at 1315 (quoting *Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459 (9th Cir.1994)). In view of the Second Circuit's holding in *General Electric,* I am not inclined to introduce a balancing test into this Circuit's jurisprudence.

Plaintiffs also cite four administrative law cases. *See Reich v. Mashantucket Sand & Gravel,* 95 F.3d 174 (2d Cir.1996); *Florida Paraplegic Ass'n v. Miccosukee Tribe of Indians,* 166 F.3d 1126 (11th Cir.1999); *United States Dep't of Labor v. Occupational Safety & Health Review Comm'n,* 935 F.2d 182 (9th Cir.1991); and *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113 (9th Cir.1985). None of these cases involves a subpoena, and none mentions *James.* These cases are inapposite.

2. *Ransom and Smoke's sovereign immunity is not lost because plaintiffs allege unlawful and unauthorized activity*

█ Plaintiffs argue that sovereign immunity should not apply to Ransom, Smoke and McDonald because these individuals acted unlawfully as a matter of tribal law and that sovereign immunity does not shield activities that violate tribal law. Plaintiffs argue that (1) since Ransom and Smoke en-

tered into its land purchase agreement with defendant Park Place "in their capacity as Tribal Council members, rather than Mohawk Gaming Authority members, their action exceeded the scope of their authority," and they cannot raise sovereign immunity, and (2) that Ransom, Smoke and McDonald exceeded the scope of their authority by engaging in unlawful and/or criminal activity, and should not be possessed of sovereign immunity for those activities.

None of these allegations was raised before the Magistrate Judge. I will not entertain them on appeal.[7]

3. *The Magistrate Judge erroneously held that the Gaming Authority did not waive immunity in the LPA*

■ Plaintiffs argue that the Magistrate Judge's Order holding that the provisions contained in the LPA did not waive the Tribe's sovereign immunity in connection with the subpoenas was clearly erroneous. The Tribe argues that the Magistrate Judge properly applied the law in finding that immunity had not been waived.[8] I conclude that Judge Yanthis was in error for two reasons: (1) First, he failed to give any weight to the Gaming Authority's explicit statement in the LPA that its conceded waiver of sovereign immunity was to be construed "liberally to permit full litigation of disputes arising under or out of the Agreement," LPA, § 14.10, and (2) Second, Ransom and Smoke, like all other tribal members enjoy no sovereign immunity as individuals, and can therefore be compelled to appear and answer questions unrelated to tribal governance.

■ In *Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), the Supreme Court reaffirmed the doctrine that an Indian tribe is not subject to suit in a state court unless "Congress has authorized the suit or the tribe has waived immunity." *Id.* at 754, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981. To relinquish tribal immunity, a tribe's waiver must be clear and unequivocal. *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 121 S.Ct. 1589, 1591, 149 L.Ed.2d 623 (2001) (citing *Oklahoma Tax Com'n v. Citizen Band of Potawatomi Tribe of Okla.*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). This court concludes that the waiver of immunity in the LPA clearly waived immunity to the subpoenas against Ransom and Smoke in this action.

The Magistrate Judge's interpretation of the contract is far too narrow. While ordinarily I would agree that a waiver of sovereign immunity should be narrowly construed, this particular waiver states that it is to be construed "broadly" and to encompass "the full litigation of disputes arising under or out of this Agreement." The dispute being litigated here clearly arises out of the Agreement, as it concerns allegedly illegal interference with and frustration of the fulfillment of the Agreement. The full litigation of this dispute cannot possibly take place unless the persons representing the Gaming Authority—the persons who are alleged to have had contact with defendant and to have made decisions based on Park Place's illegal interference with the contract—can be deposed.[9] It is thus fair to say that "the full litigation of disputes arising…out of this Agreement" cannot occur unless the subpoenas directed to Smoke and Ransom are enforced.

The Tribe contends that its waiver applies only to suits brought against it for specific performance under the LPA—and indeed

---

7. In any event, the argument that Mc, Ransom and Smoke acted outside their authority because they illegally abrogated their arrangement with plaintiffs is circular. This lawsuit is about deciding whether Park Place induced the Tribe to do something wrongful. Until the trial, I can hardly presume that the result will favor plaintiffs.

8. The Tribe also maintains that the LPA is invalid in order to preserve its arguments for appeal. This Court held that the LPA was fully executed

and binding on both parties, *Catskill Dev. L.L.C. v. Park Place Ent. Corp.*, 154 F.Supp.2d 696, 704–05 (S.D.N.Y.2001) *("Catskill II ")*, and will not reverse that decision.

9. I note that the person with whom they allegedly had contact—Arthur Goldberg, of Park Place—died before this lawsuit was filed, so that alternative source of information is unavailable.

Section 12.01 of the LPA limits Catskill from bringing any direct action against the Gaming Authority for any remedy except specific performance. But far from establishing that the waiver of sovereign immunity is limited to such actions, the presence in the LPA of Section 12.01 actually proves that the waiver cannot be read as so limited. The waiver applies by its terms to actions "in law or equity or in administrative proceedings or proceedings in arbitration" commenced "by any person with standing to maintain an action." As no action in law can be maintained by Catskill against the Gaming Authority, the waiver must extend beyond actions maintainable under Section 12.01 of the LPA. Similarly, the reference to arbitration would be meaningless if the waiver were limited to actions brought against it for violation of the contract, since there is no arbitration provision in the contract. And while disputes arising "under" the contract would be limited to disputes between Catskill and the Gaming Authority, disputes arising "out of" the LPA are not so limited—viz., this action. The Tribe recognized this when it extended the waiver to actions brought by "any person with standing to maintain an action," rather than simply to the parties to the contract.

Finally, the waiver appears to contemplate that non-party subpoenas may be necessary in order for "full litigation of disputes arising under or out of this Agreement" to take place. Otherwise, there would be no need to refer to actions "at law" (which Catskill cannot maintain against the Mohawks) or to "any person with standing to maintain an action" (encompassing as it does persons other than the Gaming Authority and Catskill). Since the Tribe would not be a party to an action at law by Catskill, and might not be a party to an action or proceeding brought by some third party who has standing to sue to resolve a dispute arising out of the Agreement, the only way a waiver of sovereign immunity could extend to such a proceeding would be if it gave third party testimony in that proceeding.

■ The Magistrate Judge's interpretation of the waiver clause is flawed in that it reads explicit provisions of the LPA right out of the Agreement, in violation of the legal canon that contracts are to be read so as to give meaning to all their terms. *United States Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044 (2d Cir.1989); *Robert J. McRell Assoc., Inc. v. Insurance Co. of North America*, 677 F.Supp. 721, 727 (S.D.N.Y.1987). Giving meaning to all the terms of the waiver, including the provision that it be construed broadly—even though Judge Yanthis correctly noted that this is NOT the usual rule—I find that it runs to subpoenas ad testificandum directed to non-party officers of the Gaming Authority (the arm of the Tribe that has waived immunity) in this action at law brought to enforce a dispute that arises out of the LPA. Mses. Ransom and Smoke signed the contract in their capacity as officers of the Gaming Authority; they are bound by all its terms, and cannot evade them by putting on their hat as putative Tribal Chiefs.

■ To the extent plaintiffs seek testimony from Ransom and Smoke about their actions as officials of the Gaming Authority, they have no ground to complain. Indeed, since Tribal members as individuals do not enjoy sovereign immunity except when they are tribal officials acting in their official capacity and within the scope of their authority, *Puyallup Tribe, Inc.*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Davis v. Littell*, 398 F.2d at 84–85; *Niagara Mohawk Power Corp.*, 862 F.Supp. at 1002, plaintiffs are free to question them about both Gaming Authority matters and any other matters relevant to this action that do not involve questions of tribal governance (though I cannot imagine that there are any such matters).

The Ransom and Smoke subpoenas are reinstated. As I expect plaintiffs to try to push the edge of the envelope when questioning, and defendants and the Tribe to allege that everything is a matter of tribal governance, they are to be deposed in the presence of Judge Yanthis, who will rule on all disputed questions in accordance with this opinion.

■ I decline to set aside the order quashing the subpoena addressed to McDonald. The record is, frankly, far too

sparse to allow me to do anything else. McDonald is identified only as the Executive Director of the Tribe, which I will assume (no argument to the contrary having been made) is an official of the Tribe. He is not identified as having anything to do with the Gaming Authority. He did not sign the LPA on the Gaming Authority's behalf, as Ransom and Smoke did. Plaintiffs have not specified what testimony they seek from McDonald that would either (1) be covered by the Gaming Authority's waiver of immunity or (2) fall outside the bounds of actions taken in his official capacity. This objection to Judge Yanthis's order is overruled.

### C. The Walker and Waterman Subpoenas

■ Plaintiffs argue that the Magistrate Judge erroneously extended tribal sovereign immunity to the tribe's non-member attorneys Hans Walker, Jr. and Bradley Waterman. The Tribe contends that the Tribe's attorneys are protected by sovereign immunity, and it was not clear error for the Magistrate Judge to find that Walker and Waterman were the Tribe's attorneys and to extend tribal immunity to them for purposes of these subpoenas.

In the Tribe Quash Order, the Magistrate Judge stated that, since plaintiffs "do not dispute that the subpoenas . . . were directed at procuring information about the Tribe's business and the attorneys' work on behalf of the Tribe," and since plaintiffs "do not contend that [the attorneys] were acting outside the scope of their authority," the Tribe's sovereign immunity extends to Walker and Waterman. *See* Tribe Quash Order, p. 2, n. 2.

■ As a general proposition, a tribe's attorney, when acting as a representative of the tribe and within the scope of his authority, is cloaked in the immunity of the tribe just as a tribal official is cloaked in that immunity. *See, e.g., Gaming Corp. of America v. Dorsey & Whitney,* 88 F.3d 536, 550 (8th Cir.1996); *Stock West Corp. v. Taylor,* 942 F.2d 655, 664–65 (9th Cir.1991), *modified on rehearing,* 964 F.2d 912 (9th Cir.1992) (en banc) (tribal attorneys may qualify as a "tribal official" if their actions are "clearly tied to their roles in the internal governance of the tribe"); *Davis v. Littell,* 398 F.2d 83, 84–85 (9th Cir.1968), *cert. denied,* 393 U.S. 1018, 89 S.Ct. 621, 21 L.Ed.2d 562 (1969); *Great Western Casinos, Inc. v. Morongo Band of Mission Indians,* 74 Cal.App.4th 1407, 1423–24, 88 Cal.Rptr.2d 828 (2d Dist.Ct.App.), *review denied,* 1999 Cal. LEXIS 9092 (Dec. 21, 1999), *cert. denied,* 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000); *Diver v. Peterson,* 524 N.W.2d 288, 292 (Minn.Ct.App.1994), *review denied* (Minn Feb. 14, 1995); *White Mountain Apache Indian Tribe v. Shelley,* 107 Ariz. 4, 7–8, 480 P.2d 654, 657–58 (1971).

In *Gaming Corp. of America,* the Eighth Circuit rejected claims that a tribe's general counsel could be liable in tort for allegedly making a management company appear unsuitable as a manager for the tribe's gaming operations during the licensing process. The Court stated that "Tribes need to be able to hire agents, including counsel, to assist in the process of regulating gaming. . . . If the tribe's relationship with its attorney, or attorney advice to it, could be explored in litigation in an unrestricted fashion, its ability to receive the candid advice essential to a thorough licensing process would be compromised." *Id.,* 88 F.3d at 550.

A California appeals court has held that a tribe's non-Indian law firm was immune from suit for allegedly counseling and conspiring with the tribe to wrongfully terminate a casino management contract. The court held that "In providing legal representation—even advising, counseling and conspiring with the tribe to wrongfully terminate the management contract—counsel were similarly immune from liability for those professional services." *Great Western Casinos,* 74 Cal. App.4th at 1423, 88 Cal.Rptr.2d 828 (citing *Davis v. Littell,* 398 F.2d at 85 and *Gaming Corp. of America,* 88 F.3d 536). The court continued: "Refusing to recognize an extension of a tribe's sovereign immunity to cover general counsel's advice to the tribe could not only jeopardize the tribe's interests but could also adversely influence counsel's representation of the tribe in the future. For these reasons, counsel, in allegedly advising the tribe to wrongfully terminate the management contract, are similarly covered by the tribe's sovereign immunity." *Id.*

Tribal attorneys possess sovereign immunity only to the extent that a tribal official possesses sovereign immunity, so to the extent sovereign immunity has been waived by the Tribe, the waiver extends to the attorneys. In addition, the attorney must be acting as a representative of the tribe and within the scope of his authority.

Plaintiffs' subpoenas commanding the attorneys' appearances for testimony and the production of a voluminous amount of documents were extremely broad. They go far beyond the waiver of privilege found by the Court. The tribal sovereign immunity enjoyed by outside counsel acting in their representative capacity cloaks Walker and Waterman from the enforcement of these subpoenas as originally served. Judge Yanthis did not err in quashing them.

During oral arguments held on February 8, 2002, plaintiffs represented to me that they would limit their inquiry of the attorneys to questions about public statements made by Waterman on or about a year after the Tribe signed its contract with Park Place. [Transcript of 2/8/2002 Hearing, at.39, line 23—40, line 5.] Waterman allegedly made a public statement explaining to the local community the Tribe's reasons for jettisoning plaintiffs and signing with defendant. Plaintiffs also refer to similar statements printed in a newspaper article. These statements supposedly refer to plaintiffs' unsuitability as a casino developer for the Tribe.

Waterman's public statements concern the reasons for terminating Catskill's casino project and thus fall within the waiver of privilege. An attorney's public announcements are, of course, non-privileged. I question the relevance of an attorney's public statements about a casino project made over a year after plaintiffs' alleged injury occurred, but they are admissible at trial for whatever they tend to show.

 The Tribe has indicated that it will not waive attorney-client privilege with regard to communications with its attorneys concerning these statements. If depositions of the attorneys proceeded, the attorney-client privilege would bar Mr. Waterman from testifying as to any client communications that preceded or resulted from these extrajudicial public statements. *See In re von Bulow,* 828 F.2d 94 (2d Cir.1987) (holding that the extrajudicial disclosure of an attorney-client communication does not waive the privilege as to undisclosed portions of the communication, and does not waive the privilege as to the subject matter of the information). I am not inclined to force Judge Yanthis to referee a deposition at which no meaningful testimony can be elicited. Therefore, I direct Mr. Waterman to respond to the subpoena in writing to the limited extent of identifying the source of Mr. Waterman's information for the statements about plaintiffs that he made publicly. If the source is not privileged, he will proceed to deposition on that single issue. It will be a very short deposition. The subpoena directed to Mr. Walker remains quashed.

### D. The Key Bank Subpoena

 Plaintiffs' Key Bank subpoena demanded production of "Monthly bank statements, including check [sic] and deposit slips, whether personal and/or commercial, opened and/or maintained by the Mohawks." Key Bank Subpoena Addendum, p. 13. Upon the Tribe's objection to this subpoena on sovereign immunity grounds, Magistrate Judge Yanthis quashed the subpoena and found as follows:

Clearly, based upon the Court's previous ruling [in the Tribe Quash Order], had plaintiffs subpoenaed *the Tribe* demanding that it produce these bank records, the Tribe's sovereign immunity would prevent enforcement of the subpoena. The outcome does not change simply because the subpoenaed documents are held by a third party and not by the Tribe itself.

Key Bank Quash Order, at 1–2.

Plaintiffs argue that the Magistrate Judge's conclusions that the Tribe had standing to object to the Key Bank subpoena and that tribal sovereign immunity extends to Key Bank were contrary to law and should be set aside. The Tribe counters that they do have standing to challenge the Key Bank subpoena, and that tribal immunity does extend to their banking documents.

Plaintiffs argue that a non-subpoenaed person lacks standing to challenge a subpoena served on another seeking the production of the non-subpoenaed person's records, and cites to *Pkfinans Int'l Corp. v. IBJ Schroder Leasing Corp.*, 1996 WL 525862 (S.D.N.Y. Sept.17, 1996). The Tribe argues, however, that numerous cases in this District hold that a party whose banking records are subpoenaed has standing to oppose the subpoena, including the *Pkfinans* case cited by plaintiffs. *See, e.g., Pkfinans,* 1996 WL 525862, at *2 n. 3 (S.D.N.Y. Sept.17, 1996) (finding that defendant had a shared privilege interest with its parent company and bank, and therefore had standing to contest the discovery); *Sierra Rutile Limited v. Katz,* 1994 WL 185751, at *2, 1994 U.S. Dist. LEXIS 6188, at *6-7; *Trump v. Hyatt Corp.,* 1994 WL 168021, at *1, 1994 U.S. Dist. LEXIS 5624, at *1 (S.D.N.Y. Apr. 29, 1994); *Carey v. Berisford Metals Corp.,* 1991 WL 44843, at *8 (S.D.N.Y. Mar.28, 1991) (finding that plaintiff had a privacy interest in his bank records sufficient to give him standing to contest discovery); *Chazin v. Lieberman,* 129 F.R.D. 97, 98 (S.D.N.Y.1990). The law is in the Tribe's favor; I find that the Magistrate Judge correctly found that the Tribe had standing to object to the Key Bank subpoena.

█ Without reaching the issue of whether Key Bank shares the Tribe's sovereign immunity, this Court finds that the Magistrate Judge correctly quashed the Key Bank subpoena because the request for documents is nothing more than a fishing expedition. At oral argument, Plaintiffs present no legitimate need for the tribal bank account information, and have shown no good faith basis for extending discovery to tribal or personal banking records. They hope to find large bank deposits that may represent winnings by the Tribal decision-makers at Park Place casinos, which may in turn be found to be some sort of bribe or gratuity designed to turn the Mohawks against Catskill. But this is not a prosecutorial investigation—it is a civil lawsuit. No fishing expeditions will be tolerated.

**E. Certification of Order for Interlocutory Appeal is Not Appropriate**

█ At the close of oral arguments on February 8, 2002 (and off the record), counsel for the Tribe moved to certify the sovereign immunity issues for interlocutory appeal. Counsel did not specify whether he moved pursuant to 28 U.S.C. 1292(b) or Fed. R.Civ.P. 54(b). I decline to certify on either ground.

█ The Tribe moves for certification of the issues herein because this Order is not otherwise immediately appealable to the Second Circuit. Section 1291 permits review only of "final" district court orders. 28 U.S.C. § 1291. The general rule is that orders enforcing subpoenas are not final, and therefore, not appealable. *United States v. Ryan,* 402 U.S. 530, 532-33, 91 S.Ct. 1580, 1581-82, 29 L.Ed.2d 85 (1971); *Cobbledick v. United States,* 309 U.S. 323, 328, 60 S.Ct. 540, 543, 84 L.Ed. 783 (1940); *In re Grand Jury Subpoena,* 6 Fed.Appx. 86, 2001 WL 409515, at *2 (2d Cir. Apr.19, 2001); *United States v. Construction Products Research, Inc.,* 73 F.3d 464, 468 (2d Cir.1996); *see also New Pacific Overseas Group (U.S.A.) Inc. v. Excal Intern. Devel. Corp.,* 252 F.3d 667, 669 (2d Cir.2001) (finding that an order imposing discovery sanctions against an attorney is not "final" under § 1291). In order to obtain appellate review, the subpoenaed party must defy the district court's order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291. *Ryan,* 402 U.S. at 532, 91 S.Ct. at 1581; *Cobbledick,* 309 U.S. at 328, 60 S.Ct. at 543. "The purpose of this rule is to discourage parties from pursuing appeals from orders enforcing these subpoenas, which would temporarily halt the district court's litigation process or the grand jury process." *Reich v. National Eng'g & Contracting Co.,* 13 F.3d 93, 95 (4th Cir.1993).

█ The courts have carved out a narrow exception to the requirement that an appealable order be a final one in the "collateral order" doctrine. An order enforcing a subpoena is immediately appealable under the collateral order doctrine only when the interlocutory order is "conclusive, ... resolve[s] important questions separate from the mer-

its, and ... [is] effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers County Com'n*, 514 U.S. 35, 42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (citing *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). The issues involved in the Tribe's likely appeal are not "completely separate" from the merits of this action, as an order compelling disclosure of privileged or confidential information would be. *See Cunningham v. Hamilton County, Ohio*, 527 U.S. 198, 202, 119 S.Ct. 1915, 1919, 144 L.Ed.2d 184 (1999). In fact, the issue of whether Ransom, Smoke and Waterman must give testimony to plaintiffs' counsel is directly linked to the merits of the action if they provide testimony corroborating plaintiffs' many allegations in this action.

 Section 1292(b) provides that a district judge may certify an order for interlocutory appeal if the judge (1) is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion," and (2) "an immediate appeal from the order may materially advance the termination of the litigation." 28 U.S.C. 1292(b). "Section 1292(b) certification is reserved for cases of unusual significance, those in which a ruling is of practical importance going well beyond run-of-the-mill concerns of parties before the Court." *In re Auction Houses Antitrust Litigation*, 164 F.Supp.2d 345, 348 (S.D.N.Y. 2001) (citing *Romea v. Heiberger & Assocs.*, 988 F.Supp. 715, 716 (S.D.N.Y.1998)).

There is no controlling question of law as to which there is a substantial ground for difference of opinion present in this Memorandum and Order. The controlling question of law—the existence of sovereign immunity—was found in favor of the Tribe. No one disputes that the LPA contains some sort of waiver of that sovereign immunity. This Court simply construed that waiver to determine its scope. Differences over contract construction are not the sort of "controlling question of law" that normally gives rise to interlocutory certification. Moreover, immediate appeal will not advance termination of this lawsuit.

 Fed.R.Civ.P. 54(b) also provides a mechanism by which the court may certify a judgment as "final" so as to permit an interlocutory appeal. A Rule 54(b) certification is predicated upon a showing of the following: (1) the resolution of at least one claim or final resolution of the rights and liabilities of at least one party, and (2) there is no just cause for delay. A district court's power to certify an order resolving fewer than all claims as final judgment should be used only in the "infrequent harsh case" where there exists some "danger of hardship or injustice through delay which would be alleviated by an immediate appeal." *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 86 (2d Cir.1998) (quoting *Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183 (2d Cir.1978)).

The Tribe argues that denial of the motion to quash the Ransom and Smoke subpoenas is "final" as to it, and that the Tribe would be irreparably damaged if Ransom and Smoke are forced to respond to a subpoena. This argument is flawed. First, courts have continuously held that an order enforcing a subpoena is not final. *See Ryan*, 402 U.S. at 532–33, 91 S.Ct. at 1581–82; *Cobbledick*, 309 U.S. at 328, 60 S.Ct. at 543; *In re Grand Jury Subpoena*, 6 Fed.Appx. 86, 2001 WL 409515, at *2; *Construction Products Research, Inc.*, 73 F.3d at 468; *see also New Pacific Overseas Group*, 252 F.3d at 669. Second, and in any event, the Tribe is not without a remedy. Ransom and Smoke can decline to honor the subpoena, be held in contempt, and appeal the contempt order. That is the customary remedy for a party aggrieved by the failure to quash a subpoena. *Ryan*, 402 U.S. at 532, 91 S.Ct. at 1581.

The Tribe's request for certification to the Second Circuit is denied.

### F. Other Discovery Issues Raised by Plaintiffs

As these parties spend far too much time in discovery disputes, by the time the sovereign immunity issue was fully briefed, appeals from two other orders of Judge Yanthis had reached my office. They are disposed of as follows:

■ 1. Judge Yanthis did not clearly err in striking Requests No. 9, 10, 11 and 12 from Plaintiffs' Second Request for Production of Documents. The requests are both irrelevant and unduly burdensome. This case turns on whether Park Place tortiously induced the Tribe to enter into a contract with defendant that had the effect of terminating its seven-year relationship with plaintiffs—not on whether Park Place was a suitable replacement for plaintiffs. Wrongful interference would include telling lies to the Gaming Authority representatives, which makes information about plaintiffs arguably (if marginally) relevant. But Park Place's troubles as a casino operator are not what this case is about. Moreover, plaintiffs have asked for production of every record relating to every complaint, lawsuit and proceeding against a public company that runs 28 casinos nationwide—a request that is overbroad on its face, especially in view of Park Place's status as both a public company and a heavily regulated one, which means that it is regularly required to disclose material adverse actions taken against it and other matters that might affect its suitability to run a casino. Those disclosures are in the files of public agencies, and are available to plaintiffs and to anyone else (including, by the way, the St. Regis Mohawk Tribe) who chooses to file a FOIA request.

Plaintiffs' Objection to the January 15, 2002 order is overruled.

■ 2. Judge Yanthis did not clearly err in refusing to permit plaintiffs to question a Park Place witness, Carlos Castro, about the income Park Place expected to derive from its casino project in the Catskills.

A bit of background is in order. Last August, Judge Yanthis (who spends most of his time ruling on discovery disputes in this case) issued an order setting a date limit on Park Place's document production. Under the order, Defendant was not required to produce any documents generated after April 14, 2000—the date it signed the offending contract with the Mohawks—other than documents generated after that date that made specific reference to plaintiffs and their project. In particular, Judge Yanthis rejected plaintiffs' argument that Park Place's projec-

tions about revenues to be derived from its project were relevant to plaintiffs' proof of damages. Judge Yanthis gave plaintiff leave to renew its request for documents post-dating April 14, 2000 if plaintiffs could point to deposition testimony or other discovery that demonstrated a need for "certain materials." Plaintiffs did not take an appeal from this order within the ten days permitted by Fed.R.Civ.P. 72(a). It is, therefore, non-reviewable.

To the extent that plaintiffs attempted to ask Mr. Castro questions that were inconsistent with the spirit of Judge Yanthis' ruling from last August, the Magistrate Judge quite properly sustained Park Place's objection to those question, based on his earlier ruling, which had been neither appealed from nor revisited. Plaintiffs would have me cast their application to Judge Yanthis as a motion for renewal. In fact, it was not. However, I accept plaintiffs' invitation to re-characterize what they did. After review, I conclude, as Judge Yanthis did, that plaintiffs failed to make the sort of showing necessary to reopen the learned Magistrate Judge's earlier ruling.

Judge Yanthis authorized plaintiffs to make a motion for renewal, based on evidence of materiality that had been gathered in discovery. He did not invite plaintiffs to rehash the same arguments that had failed to persuade him last summer. Review of the transcript of the January 17, 2002 conference reveals that a rehash of old arguments is all that plaintiffs offered. In particular, plaintiffs did not point to any material developed in connection with discovery that more clearly and conclusively demonstrated why Park Place's revenue projections were relevant to Catskill's damages claims. Plaintiffs did call Judge Yanthis' attention to several pre-April 14, 2000 documents that Defendant had not produced—plaintiffs had obtained them from third parties—but all that suggests is that Park Place has not fully complied with the existing order. That may be a reason to sanction Park Place, but it is not a reason why Judge Yanthis should expand the scope of his prior ruling. Plaintiffs' objection to Judge Yanthis' order of January 17, 2002 is overruled.

3. In light of this ruling and the need for further discovery in this case, I hereby extend the deadline for the close of all discovery to Friday, March 29, 2002.

## III. CONCLUSION

For the reasons stated above and in accordance with the limitations stated above, the Magistrate Judge's December 28, 2001 Orders are reversed as they pertain to the Ransom and Smoke subpoenas, are reversed in part and sustained in part as they pertain to the Waterman subpoena, and, and are sustained as they pertain to the Walker, McDonald and Key Bank subpoenas. The Tribe's oral motion for certification to the Second Circuit is denied.

Plaintiffs' objections to Judge Yanthis' January 15, 2002 Order and his January 17, 2002 Order are overruled.

