CASH ADVANCE AND PREFERRED CASH LOANS, Petitioners/Cross–Respondents

v.

STATE of Colorado, ex. rel. John W. Suthers, Attorney General and Laura E. Udis, Administrator, Uniform Consumer Credit Code, Respondents/Cross–Petitioners.

No. 08SC639.

Supreme Court of Colorado, En Banc.

Nov. 30, 2010.

1100

Jones & Keller, P.C., Edward T. Lyons, Jr., Thomas J. Burke, Jr., Denver, Colorado, Fredericks & Peebles, LLP, Conly J. Schulte, Shilee T. Mullin, Omaha, Nebraska, Attorneys for Petitioners/Cross–Respondents.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Jan M. Zavislan, Deputy Attorney General, Paul Chessin, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Respondents/Cross–Petitioners.

Wynkoop & Thomas P.C., Rick Wynkoop, Denver, Colorado, Attorneys for Amici Curiae AARP, Center for Responsible Lending, Consumer Federation of America, National Association of Consumer Advocates, and National Consumer Law Center.

Greenberg Traurig LLP, Jennifer H. Weddle, Denver, Colorado, Attorneys for Amicus Curiae the Colorado Indian Bar Association.

Peter Ortego, Towaoc, Colorado, Attorney for Amicus Curiae the Ute Mountain Ute Tribe.

American Indian Law Clinic, University of Colorado School of Law, Jill Tompkins, Boulder, Colorado, Attorneys for Amicus Curiae the University of Colorado School of Law, American Indian Law Clinic.

American Indian Law Center, Inc., Helen Padilla, Albuquerque, New Mexico, Attorneys for Amicus Curiae the American Indian Law Center, Inc.

Thomas J. Miller, Iowa Attorney General, Jessica J. Whitney, Assistant Attorney General and Deputy Administrator of the Iowa Consumer Credit Code, Des Moines, Iowa, Attorneys for Amici Curiae Group of 13 State Attorney Generals and the National Association of Consumer Credit Administrators.

Justice MARTINEZ delivered the Opinion of the Court.

This tribal sovereign immunity case requires us to address the relationship between the State of Colorado and sovereign American Indian tribes, as that relationship is governed by federal law. We are charged with applying the doctrine of tribal sovereign immunity in the context of a state investigative subpoena enforcement action against two entities operating under the trade names Cash Advance and Preferred Cash Loans and asserting they are entitled to immunity as "arms" of the Miami Nation of Oklahoma and the Santee Sioux Nation, both federally recognized Indian tribes.

The tribal entities appealed from the trial court's denial of their motion to dismiss the action for lack of subject matter jurisdiction. The court of appeals reversed and remanded, finding that the trial court erred in denying the motion on the basis that tribal sovereign immunity does not apply to the state's investigatory subpoena enforcement action. *State ex rel. Suthers v. Cash Advance*, 205 P.3d 389, 399 (Colo.App.2008). The court of appeals directed that the trial court determine on remand whether Cash Advance and Preferred Cash Loans are arms of the tribes entitled to immunity and articulated an eleven-factor test for the trial court to apply.

After compelling the tribal entities to produce additional information relevant to the immunity determination, the court of appeals further determined that tribal sovereign immunity does not extend to individual tribal officers in this case; that the tribal entities may have waived their immunity via contract with Colorado consumers; and that the state bears the burden of proof to show that Cash Advance and Preferred Cash Loans are not entitled to immunity.

The parties cross-petitioned for a writ of certiorari, which we granted. Although we affirm the judgment of the court of appeals, we disagree with portions of its analysis and its directions to the trial court on remand.

We hold that tribal sovereign immunity applies to state investigatory enforcement actions. The trial court, on remand, must determine whether Cash Advance and Preferred Cash Loans act as arms of the Miami Nation of Oklahoma and the Santee Sioux Nation, respectively, such that their activities are properly deemed to be those of the tribes. In making this determination, the trial court shall consider the following factors, each of which focuses on the relationship between the tribal entities and the tribes: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty.

Recognizing that sovereign tribes necessarily act through individuals, we hold further that tribal sovereign immunity protects tribal officers acting within the scope of their lawful authority, as defined by the tribe and limited only by federal law.

Additionally, we hold that tribal sovereign immunity is jurisdictional in nature. Because it is akin to subject matter jurisdiction, we find that tribal sovereign immunity is properly raised in a C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Consequently, on remand, the state bears the burden of establishing by a preponderance of the evidence that the trial court has subject matter jurisdiction over Cash Advance and Preferred Cash Loans.

To assure that the trial court is not misled by the court of appeals' discussion of waiver, we also hold that any waiver of tribal sovereign immunity must be explicit and unequivocal.

Finally, we hold that the tribal entities, by voluntarily providing the state with certain information relevant to the immunity determination, unequivocally waived any immunity they might possess with respect only to that information directly relevant to their entitlement to immunity. Accordingly, on remand, the trial court must determine whether discovery requests are properly tailored to the immunity determination and therefore fall within the scope of the tribal entities' waiver.

Thus, we affirm the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.

## I. Facts & Procedural History

In January 2005, the Colorado Attorney General and the Administrator of the Uniform Consumer Credit Code (collectively "the state") issued investigative, administrative subpoenas to lenders operating under the trade names Cash Advance and Preferred Cash Loans. The subpoenas ordered production of documents related to Cash Advance's and Preferred Cash Loans' lending activities with Colorado consumers.[1] This subpoena enforcement action arose out of Cash Advance's and Preferred Cash Loans' failure to comply with the investigative subpoenas. Upon application by the state, the trial court entered an order enforcing the subpoenas on February 14, 2005. Cash Advance and Preferred Cash Loans did not respond. On June 20, 2005, the trial court granted the state's motion for issuance of contempt citations, ordering Cash Advance and Preferred Cash Loans to show cause why they should not be held in contempt for failure to comply with the court's order enforcing the subpoenas.

On July 20, 2005, in response to the contempt citations, two corporations, claiming they do business as Cash Advance and Preferred Cash Loans and asserting they are wholly owned subdivisions of federally recognized Indian tribes, filed a joint motion to dismiss for lack of subject matter jurisdiction pursuant to C.R.C.P. 12(b)(1), lack of personal jurisdiction pursuant to C.R.C.P. 12(b)(2), and insufficiency of service of process pursuant to C.R.C.P. 12(b)(4). Miami Nations Enterprises, Inc. ("MNE") of the Miami Nation of Oklahoma claimed it conducts business under the trade name Cash Advance; SFS, Inc. ("SFS") of the Santee Sioux Nation claimed it conducts business under the trade name Preferred Cash Loans. This opinion refers to MNE and SFS collectively as "the tribal entities." With respect to the trial court's subject matter jurisdiction over the subpoena enforcement action, the tribal entities asserted that, because they are owned and operated by the tribes and do business as Cash Advance and Preferred Cash Loans, they are entitled to the tribes' sovereign immunity.

The aboriginal territory of the Miami people is located in what today are Ohio, Indiana, Illinois, lower Michigan, and lower Wisconsin. The 1795 Treaty of Greenville ceded much of this territory to the United States. Then, in 1846, the U.S. government forcibly removed the Miami people from what remained of their homeland, first to present-day Kansas and later to "Indian Territory," now Oklahoma. Via the Oklahoma Indian Welfare Act of 1936, ch. 831, § 1, 49 Stat.1967 (codified at 25 U.S.C. § 501 (2006)), the U.S. government formally recognized the Miami Tribe of Oklahoma and subsequently approved the tribe's constitution. *See also* Federally Recognized Indian Tribe List Act of 1994, Pub.L. No. 103–454, § 104, 108 Stat. 4791, 4792 (1994) (codified at 25 U.S.C. § 479a–1 (2006)); 73 Fed.Reg. 18553, 18555 (Apr. 4, 2008). Citing "a critical need for the development of economic activities ... to provide for the well being of the citizens of the Miami Tribe," the tribe established MNE as "a subordinate economic enterprise of the Miami Tribe of Oklahoma having the purposes, powers, and duties as herein or hereafter provided by tribal law." *Amended*

---

1. Specifically, the subpoenas ordered production of documents regarding, inter alia, Cash Advance's and Preferred Cash Loans' incorporation, organization, officers, employees, licensing, operation, marketing, websites, and loans to Colorado consumers.

*Miami Nation Enterprises Act,* §§ 2(a), 101(a) (May 10, 2005).[2]

The ancestral homeland of the Santee division of the Sioux people is located in present-day Minnesota. Following the 1862 hanging in Mankato, Minnesota of thirty-eight Santee Sioux charged with rape or murder—the largest mass-execution in U.S. history—the U.S. government abrogated its prior treaties with the Santee Sioux and forcibly relocated them first to present-day South Dakota and later to present-day northeastern Nebraska. Via the Indian Reorganization Act of 1934, ch. 576, § 1, 48 Stat. 984 (codified at 25 U.S.C. §§ 461–479 (2006)), the U.S. government officially recognized the Santee Sioux Nation and subsequently approved the tribe's constitution. *See also* Federally Recognized Indian Tribe List Act of 1994, Pub.L. No. 103–454, § 104, 108 Stat. 4791, 4792 (1994) (codified at 25 U.S.C. § 479a–1 (2006)); 73 Fed.Reg. 18556. Determining that "it is in the best interests of the Tribe to establish[ ] a tribally-owned corporation to facilitate the achievement of goals relating to the Tribal economy, self-government, and sovereign status of the Santee Sioux Nation," the tribe incorporated SFS as "an economic and political subdivision of the Santee Sioux Nation." *Resolution 2005–27 of the Santee Sioux Nation* (Mar. 2, 2005).[3]

The trial court did not rule on the tribal entities' motion to dismiss for nearly two years, during which time the state attempted to compel information regarding Cash Advance's and Preferred Cash Loans' relationship with the tribal entities and the tribes themselves. Throughout a series of requests for information, responses, motions to compel, motions for sanctions, and orders compelling limited discovery of information relevant to the pending immunity claim, the tribal entities maintained that they are immune from all judicial action, including compelled discovery. The tribal entities did, however, voluntarily produce documents which they claimed were sufficient to establish their entitlement to tribal sovereign immunity. These documents included, inter alia, tribal constitutions, statutes, resolutions, correspondence regarding constitutional amendments, license applications, and licenses to conduct business.

The trial court eventually denied the tribal entities' motion to dismiss on March 5, 2007. The trial court found that, as a matter of law, tribal sovereign immunity cannot protect tribal entities from the state's investigative subpoena enforcement action:

> Whether the Tribal Entities in this matter possess [tribal sovereign] immunity, and whether they have or have not waived it, need not be determined by this Court. As [the state] correctly argue[s,] tribal sovereign immunity does not prohibit a state from investigating violations of its own laws occurring within its own borders. . . .
>
> The Tribal Entities' motion to dismiss is DENIED insofar as it relies upon the doctrine of tribal sovereign immunity serving as a bar to the power of the State of Colorado to investigate and prosecute violations of its own laws, committed within the State of Colorado, by tribal entities acting outside of tribal lands.

(R. at 1417.)[4] The tribal entities immediately appealed this order.[5]

The court of appeals reversed and remanded, holding that tribal sovereign immunity applies to state investigatory enforcement actions. *Cash Advance,* 205 P.3d at 399. It directed that the trial court determine on remand whether Cash Advance and Preferred Cash Loans are arms of the Miami

---

2. This act is available in the record at 466–80.

3. This resolution is available in the record at 408–09.

4. The trial court also denied the tribal entities' claims of insufficient service of process and lack of personal jurisdiction. The parties did not appeal these rulings.

5. The tribal entities filed their notice of appeal on March 23, 2007. On March 30, the trial court held an advisement hearing on the contempt proceedings, at which the tribal entities appeared for the purpose of asserting that the appeal had divested the trial court of jurisdiction to hold the hearing. Nevertheless, the trial court issued arrest warrants for the chief executive officer of MNE and the treasurer of SFS. The trial court subsequently changed course and stayed the warrants pending the outcome of the interlocutory appeal.

Nation of Oklahoma and the Santee Sioux Nation, respectively, and thereby entitled to the tribes' sovereign immunity. The court of appeals articulated an eleven-factor test— borrowed from the dissent in a Washington Supreme Court case, *Wright v. Colville Tribal Enter. Corp.*, 159 Wash.2d 108, 147 P.3d 1275, 1288 (Wash.2006) (Johnson, J., dissenting)—for the trial court to apply to make this determination:

> (1) whether Cash Advance and Preferred Cash are organized under the Tribes' laws or constitutions; (2) whether the purposes of Cash Advance and Preferred Cash are similar to the Tribes' purposes; (3) whether the governing bodies of Cash Advance and Preferred Cash are composed predominantly of tribal officials; (4) whether the Tribes have legal title to or own the property used by Cash Advance and Preferred Cash; (5) whether tribal officials exercise control over Cash Advance's and Preferred Cash's administration and accounting; (6) whether the Tribes' governing bodies have the authority to dismiss members of the governing bodies of Cash Advance and Preferred Cash; (7) whether Cash Advance and Preferred Cash generate their own revenues; (8) whether a suit against Cash Advance and Preferred Cash will affect the Tribes' finances and bind or obligate tribal funds; (9) the announced purposes of Cash Advance and Preferred Cash; (10) whether Cash Advance and Preferred Cash manage or exploit tribal resources; and (11) whether protection of tribal assets and autonomy will be furthered by extending immunity to Cash Advance and Preferred Cash.

*Cash Advance,* 205 P.3d at 406.

Attempting to provide additional guidance in anticipation that the trial court, on remand, might encounter a variety of complex issues related to the tribal entities' claim of sovereign immunity, the court of appeals also addressed a number of issues not directly before it. First, it determined that the trial

court must compel discovery of additional information relevant to the immunity determination and articulated a broad rule that courts have authority to compel tribes to produce documents where "the purpose of producing the documents is to enforce the law and protect the constitutional rights of defendants." *Id.* at 402. Citing the stayed arrest warrants for the individual officers of the tribal entities, the court of appeals next found that tribal sovereign immunity does not extend to tribal officers engaged in conduct allegedly violating state law because such conduct is beyond the scope of the officer's lawful authority. Next, the court of appeals directed the trial court to look to a variety of sources, including contract terms such as an arbitration clause contained in agreements with Colorado consumers, for a waiver of tribal sovereign immunity from the state enforcement action. Finally, the court of appeals held that the state bears the burden of proof on remand to show, by a preponderance of the evidence, that Cash Advance and Preferred Cash Loans are not entitled to immunity and therefore that the trial court has subject matter jurisdiction.

Responding to the court of appeals' various holdings, the parties cross-petitioned for writ of certiorari. The tribal entities challenge the court of appeals' determination that the trial court has authority to compel production of a wide variety of documents. The tribal entities also contest the court of appeals' formulation of the eleven-part test, asserting that the test is inconsistent with governing federal law. Further, the tribal entities challenge the court of appeals' holding that tribal officers who allegedly violate state law necessarily act outside the scope of their authority and therefore are not entitled to immunity. Finally, the tribal entities challenge the court of appeals' suggestion that terms contained in contracts with non-parties to this state enforcement action may effect a waiver of tribal sovereign immunity.[6]

---

6. We granted certiorari on the following issues presented by the petitioner/cross-respondent tribal entities:

(1) Whether the court of appeals erred in holding petitioners do not have tribal sovereign immunity from Colorado trial court orders

compelling them to produce information regarding their eligibility for tribal sovereign immunity.

(2) Whether the court of appeals contravened Congress's plenary power over Indian tribes by implementing its own test to determine if a

The state contests the court of appeals' determination that tribal sovereign immunity applies in the context of this investigative subpoena enforcement proceeding. The state also challenges the court of appeals' holding that the state bears the burden of proof to show, by a preponderance of the evidence, that the tribal entities are not entitled to immunity.[7]

## II. Principles of Tribal Sovereign Immunity

■ "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (citing *Cherokee Nation v. Georgia*, 30 U.S. 1, 13, 5 Pet. 1, 8 L.Ed. 25 (1831)). As Chief Justice John Marshall described nearly two centuries ago, Indian tribes are "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial...." *Worcester v. Georgia*, 31 U.S. 515, 559, 6 Pet. 515, 8 L.Ed. 483 (1832). Felix Cohen's *Handbook of Federal Indian Law*—widely considered the foremost secondary authority on federal Indian law—describes the independent origin of tribal sovereignty as follows:

> Most Indian tribes were independent, self-governing societies long before their contact with European nations, although the degree and kind of organization varied widely among them. The forms of political order included multi-tribal confederacies, governments based on towns or pueblos, and systems in which authority rested in heads of kinship groups or clans. For most tribes, these forms of self-government were also sacred orders, supported by creation stories and ceremonies invoking spiritual powers....

> The history of tribal self-government forms the basis for the exercise of modern powers. Indian tribes consistently have been recognized, first by the European nations, and later by the United States, as "distinct, independent political communities," qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty. The right of tribes to govern their members and territories flows from a preexisting sovereignty limited, but not abolished, by their inclusion within the territorial bounds of the United States. Tribal powers of self-government are recognized by the Constitution, legislation, treaties, judicial decisions, and administrative practice. They necessarily are observed and protected by the federal government in accordance with a relationship designed to ensure continued viability of Indian self-government insofar as governing powers have not been limited or extinguished by lawful federal authority. Neither the passage of time nor the apparent assimilation of native peoples can be interpreted as diminishing or abandoning a tribe's status as a self-governing entity. Once recognized as a political body of the United States, a tribe retains its sovereignty until Congress acts to divest that sovereignty.

§ 4.01[1][a], at 204–06 (Matthew Bender, 2005).

---

tribe's commercial enterprise is sufficiently connected to the tribe such that the enterprise is protected by tribal sovereign immunity.

(3) Whether the court of appeals erred by stating that tribal officers are not protected by tribal sovereign immunity when acting outside state authority.

(4) Whether the court of appeals erred by stating petitioners may have waived sovereign immunity against Colorado's enforcement actions by including arbitration clauses in loan agreements with Colorado consumers.

7. We granted certiorari on the following issues presented by the respondent/cross-petitioner state:

(5) Whether the court of appeals erred in reaching the question of sovereign immunity in an investigative subpoena enforcement proceeding.

(6) Whether the court of appeals erred in allocating the burden of proof to the state when sovereign immunity is an affirmative defense, not a challenge to the court's subject matter jurisdiction.

(7) Whether the court of appeals erred in holding the state's burden of proof is "preponderance of the evidence" when the burden of proof in an investigative subpoena enforcement proceeding is "cause to believe."

■ As described above, tribal sovereignty is an inherent, retained sovereignty that predates European contact, the formation of the United States, the U.S. Constitution, and individual statehood. Accordingly, the relevant inquiry with respect to a tribe's exercise of its sovereignty is whether Congress—which exercises plenary power over Indian affairs, *Talton v. Mayes*, 163 U.S. 376, 384, 16 S.Ct. 986, 41 L.Ed. 196 (1896)—has limited that sovereignty in any way. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 852–53, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985).

■ The long-standing, federal common law doctrine of tribal sovereign immunity is rooted in the inherent sovereignty of Indian tribes; it is "a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986). "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); *see also C & L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe*, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001); *Potawatomi*, 498 U.S. at 509, 111 S.Ct. 905; *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Congressional abrogation or tribal waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670 (quotations and citations omitted). "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States." *Kiowa*, 523 U.S. at 756, 118 S.Ct. 1700; *see also Three Affiliated Tribes*, 476 U.S. at 891, 106 S.Ct. 2305 ("[T]ribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States.").

The modern realities of tribal sovereignty explain the broad applicability of the doctrine of tribal sovereign immunity. As Indian law scholar Robert A. Williams, Jr. recognized twenty-five years ago, "[t]erritorial remoteness, an inadequate public infrastructure base, capital access barriers, land ownership patterns, and an underskilled labor and managerial sector combine with paternalistic attitudes of federal policymakers to stifle Indian Country development and investment." Robert A. Williams, Jr., *Small Steps on the Long Road to Self–Sufficiency for Indian Nations: The Indian Tribal Government Tax Status Act of 1982*, 22 Harv. J. on Legis. 335, 335–36 (1985). Because of these barriers and tribes' virtual lack of a tax base, tribal economic development—often in the form of tribally owned and controlled businesses—is necessary to generate revenue to support tribal government and services. *See generally* Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D.L.Rev. 759 (2004).

Unsurprisingly, tribes recognize the critical nature of economic development and provide for it in their laws and governing charters. For example, the preamble to the Constitution of the Santee Sioux Nation includes the purpose of forming businesses, and section 1(k) of article VI addressing the powers of self-government provides tribal council with authority to charter subordinate organizations for economic purposes.[8] Similarly, the preamble to the Constitution of the Miami Tribe of Oklahoma discusses taking advantage of opportunities for self-determination and economic independence, and section 1 of article VI provides for a Business Committee with authority to transact business and enact resolutions and ordinances to that end.[9]

■ Two established rules regarding the application of tribal sovereign immunity are derived from the reality of tribes' need to generate revenue via tribal business. First, tribal sovereign immunity applies without distinction between on- or off-reservation activities or between governmental or commercial activities. *Kiowa*, 523 U.S. at 754–55, 118 S.Ct. 1700. Despite the criticism that tribes' off-reservation, commercial business

8. The Constitution of the Santee Sioux Nation is available in the record at 421–32.

9. The Constitution of the Miami Nation of Oklahoma is available in the record at 483–92.

has, in some instances, become disconnected from tribal self-governance, Congress has not abrogated tribal sovereign immunity with respect to such activities, and the U.S. Supreme Court has upheld the doctrine's application irrespective of the location or type of activity at issue. *Id.* at 757, 118 S.Ct. 1700; *Potawatomi,* 498 U.S. at 510, 111 S.Ct. 905. Second, tribal sovereign immunity protects subordinate secular or commercial entities acting as arms of a tribe. *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.,* 585 F.3d 917, 920–21 (6th Cir.2009); *Native American Distrib. v. Seneca–Cayuga Tobacco Co.,* 546 F.3d 1288, 1292 (10th Cir.2008); *Allen v. Gold Country Casino,* 464 F.3d 1044, 1046 (9th Cir.2006); *Hagen v. Sisseton–Wahpeton Cmty. Coll.,* 205 F.3d 1040, 1043 (8th Cir.2000); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.,* 207 F.3d 21, 29 (1st Cir.2000); *see also Inyo County v. Paiute–Shoshone Indians,* 538 U.S. 701, 705 n. 1, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003) (noting that the United States asserted, and the County did not dispute, that a corporation operating a casino was an arm of the tribe for the purposes of sovereign immunity). The arm-of-the-tribe rule is discussed in detail in Section IV, infra.

### III. Application of Tribal Sovereign Immunity to State Investigatory Enforcement Actions

■ U.S. Supreme Court precedent is clear that tribal sovereign immunity applies to state law enforcement actions. Although tribes are subject to non-discriminatory state laws for off-reservation conduct, *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), they are immune from state enforcement actions with respect to those laws, *Potawatomi,* 498 U.S. at 510–11, 111 S.Ct. 905. As the U.S. Supreme Court has explained, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa,* 523 U.S. at 755, 118 S.Ct. 1700; *see also Potawatomi,* 498 U.S. at 514, 111 S.Ct. 905 (recognizing alternatives to state enforcement actions, including, inter alia, negotiating inter-governmental agreements and seeking appropriate legislation from Congress).

■ Despite the state's arguments to the contrary in this case, tribal sovereign immunity also applies to judicial enforcement of state investigatory actions with respect to alleged violations of state law. At least two federal courts have held that sovereign immunity protects a tribe against judicial enforcement of subpoenas. *United States v. James,* 980 F.2d 1314, 1319 (9th Cir.1992), *cert. denied,* 510 U.S. 838, 114 S.Ct. 119, 126 L.Ed.2d 84 (1993) (holding that the district court properly quashed a subpoena to the Quinault Indian Nation on sovereign immunity grounds); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 206 F.R.D. 78, 86 (S.D.N.Y.2002) (holding that sovereign immunity protects the St. Regis Mohawk Tribe against enforcement of non-party civil subpoena). And the U.S. Supreme Court has, on tribal sovereign immunity grounds, vacated a state court order directing the Puyallup Tribe to provide information regarding its members' off-reservation fishing activities, which the state demanded in an effort to investigate alleged violations of and enforce Washington state fishing regulations. *Puyallup Tribe, Inc. v. Dep't of Game,* 433 U.S. 165, 173, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977).

Accordingly, we hold that tribal sovereign immunity applies to this state investigative subpoena enforcement action and agree with the court of appeals that the trial court erred in denying the tribal entities' motion to dismiss on the basis that tribal sovereign immunity does not preclude enforcement of the state's investigatory powers with respect to alleged violations of state law. Based on this incorrect legal conclusion, the trial court failed to determine whether Cash Advance and Preferred Cash Loans are entitled to tribal sovereign immunity. Therefore, we also agree with the court of appeals that a remand is necessary to determine whether Cash Advance and Preferred Cash Loans are arms of the Miami Nation of Oklahoma and the Santee Sioux Nation, respectively. However, we disagree with the court of appeals with respect to the proper arm-of-the-tribe analysis for the trial court to apply on remand.

## IV. Arm–of–the–Tribe Analysis

Recognizing that Congress has not imposed any limitation on the application of tribal sovereign immunity to entities acting as arms of a tribe, all the federal courts of appeals that have addressed this issue have held that such entities are entitled to immunity. *See, e.g., Memphis Biofuels, LLC,* 585 F.3d at 920–21 (6th Cir.2009); *Seneca–Cayuga Tobacco Co.,* 546 F.3d at 1292 (10th Cir. 2008); *Allen,* 464 F.3d at 1046–47 (9th Cir. 2006); *Hagen,* 205 F.3d at 1042–43 (8th Cir. 2000); *Ninigret,* 207 F.3d at 29 (1st Cir. 2000). Although the U.S. Supreme Court has not addressed this issue, it has acknowledged that the United States has taken the position that corporate entities may be arms of the tribe entitled to the tribe's sovereign immunity. *See Inyo County,* 538 U.S. at 705 n. 1, 123 S.Ct. 1887. We are persuaded by the reasoning of the federal courts of appeals. Accordingly, in the absence of binding precedent from the U.S. Supreme Court, we must articulate the appropriate standard for the trial court to apply on remand to determine whether Cash Advance and Preferred Cash Loans are arms of the Miami Nation of Oklahoma and the Santee Sioux Nation, respectively, and therefore entitled to the tribes' sovereign immunity.

■ According to the federal courts of appeals, the proper inquiry is "whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe." *Allen,* 464 F.3d at 1046; *see also Hagen,* 205 F.3d at 1043; *Ninigret,* 207 F.3d at 29. In making this determination, those courts have considered a variety of facts that help define whether an entity acts as an arm of the tribe. The Ninth Circuit in *Allen* provided the most detailed discussion of the facts it relied upon in determining that the entity at issue, a casino, was an arm of the Tyme Maidu Tribe of the Berry Creek Rancheria entitled to sovereign immunity. 464 F.3d at 1046–47. The court considered that the tribe owned and operated the casino and that the casino's creation was dependent upon tribal government approval at numerous levels. *Id.* at 1046. Additionally, the

casino's benefits—both economic and otherwise—inured to the tribe in its sovereign capacity: the casino "enable[d] the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs." *Id.* at 1046–47. Finally, the casino's immunity directly protected the tribe's treasury. *Id.* at 1047.

The Eighth and First Circuits also have found particular entities to be arms of a tribe entitled to sovereign immunity. In *Hagen,* the Eighth Circuit considered a tribal community college chartered as a nonprofit corporation under the Sisseton–Wahpeton Sioux Tribe's constitution and controlled by a board of trustees comprised of enrolled members from the tribe's various districts. 205 F.3d at 1042. The court determined that the college "serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity." *Id.* at 1043. And in *Ninigret,* the First Circuit held, without significant discussion, that a tribal housing authority, established by the Narragansett Tribe pursuant to a tribal ordinance, was an arm of the tribe entitled to sovereign immunity. 207 F.3d at 29.

Federal case law in the analogous context of the "Indian Tribe" exemption in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b) (2006)—pursuant to which tribes enjoy immunity from liability for employment discrimination—also is instructive with respect to the facts relevant to the determination whether a tribal entity is closely enough associated with the tribe to be entitled to the tribe's immunity.[10] For example, in *Pink v. Modoc Indian Health Project, Inc.,* the Ninth Circuit determined that a nonprofit corporation "organized to control a collective enterprise" of the Alturas and Cedarville Rancherias "served as an arm of the sovereign tribes, acting as more than a mere business," and therefore qualified for the exemption. 157 F.3d 1185, 1188 (9th Cir.1998), *cert. denied,* 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999). In *Dillon v. Yankton Sioux Tribe Housing Authority,* the Eighth

---

10. The Eighth and First Circuits cited this line of cases in support of their arm-of-the-tribe holdings. *See Hagen,* 205 F.3d at 1043; *Ninigret,* 207 F.3d at 29.

Circuit found a tribal housing authority established by the Yankton Sioux Tribe was a tribal agency entitled to the exemption. 144 F.3d 581, 583 (8th Cir.1998). And in *Dille v. Council of Energy Resource Tribes,* the Tenth Circuit held that an organization representing the energy resource interests of thirty-nine Indian tribes qualified for the exemption where the purpose of the council mirrored that of the exemption "to promote the ability of sovereign Indian tribes to control their own economic enterprises"; the council was comprised entirely of member tribes; and the designated representatives of those tribes made all council decisions. 801 F.2d 373, 375–76 (10th Cir.1986).

■ We find the reasoning of these federal courts of appeals cases persuasive. Further, given the potential—in the absence of direction from the U.S. Supreme Court—for variance among the numerous state and federal courts that may have to determine whether a particular entity is entitled to immunity as an arm of a tribe, we prefer to utilize an arm-of-the-tribe analysis that is consistent with these cases. Finally, reliance on these cases mitigates the risk that the arm-of-the-tribe analysis we utilize might subsequently be found an improper state-imposed limitation on tribal sovereign immunity.[11] Accordingly, we follow the federal

courts of appeals and identify three factors, each of which focuses on the relationship between the tribal entities and the tribes, to help guide the trial court's determination whether the entities in this case act as arms of the tribes so that their activities are properly deemed to be those of the tribes: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty. We believe this arm-of-the-tribe analysis is consistent with governing federal law and is not likely to function as a state diminution of tribal sovereign immunity. *See Kiowa,* 523 U.S. at 756, 118 S.Ct. 1700.

In contrast, the court of appeals' eleven-factor test is contrary to federal law in at least some respects and threatens to intrude on tribal sovereign immunity by articulating limits on the doctrine's application for which Congress has not provided. Although some of the eleven factors relate or are similar to the three factors we articulated above, others find no support in federal law because they are not narrowly tailored to the nature of the relationship between the tribal entity and the tribe.[12] Further, at least two of the eleven factors are contrary to federal law. Factors (2) and (9)—each of which examine the pur-

11. In contrast, the Amici Curiae States invite us to ground our arm-of-the-tribe analysis in Eleventh Amendment arm-of-the-sovereign jurisprudence. In *Simon v. State Compensation Insurance Authority,* we set forth the three primary considerations for determining whether an entity is an arm-of-the-sovereign entitled to Eleventh Amendment immunity. 946 P.2d 1298, 1303 (Colo.1997). The United States Supreme Court has stated, however, that "the immunity possessed by Indian tribes is not coextensive with that of the States." *Kiowa,* 523 U.S. at 756, 118 S.Ct. 1700; *see also Blatchford v. Native Vill. of Noatak,* 501 U.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). Instead, the inherent nature of tribal sovereignty, *see, e.g., Potawatomi,* 498 U.S. at 509, 111 S.Ct. 905, requires us to distinguish tribal sovereign immunity from state sovereign immunity. Other federal courts have only analogized to arm-of-the-sovereign caselaw, all the while making it clear that they are not bound by those cases in determining whether an entity is an arm of a tribe. *See e.g., Allen,* 464 F.3d at 1047 (citing by comparison to a Supreme Court state sovereign immunity case). We prefer an approach that recognizes, without diminishing, the inherent nature of tribal sovereignty.

*See Kiowa,* 523 U.S. at 756, 118 S.Ct. 1700. We therefore decline to adopt *Simon* wholesale. Instead, as we have explained, we ground our arm-of-the-tribe analysis in federal courts of appeals cases that determine whether an entity is entitled to immunity as an arm of a tribe.

12. The source of the eleven factors used by the court of appeals is the dissent in a Washington Supreme Court case. *Cash Advance,* 205 P.3d at 405–06 (citing *Wright,* 147 P.3d at 1288 (Johnson, J., dissenting)). Three of the four other state court opinions cited by the dissenting opinion in *Wright* and discussed by the court of appeals in this case predate the U.S. Supreme Court's decision in *Kiowa,* and each of these four decisions rely, at least in part, upon the governmental versus commercial activity distinction, in contravention of *Kiowa.* *See Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents,* 84 P.3d 437, 441 (Alaska 2004); *Dixon v. Picopa Constr. Co.,* 160 Ariz. 251, 772 P.2d 1104, 1110 (1989); *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 294 (Minn. 1996); *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.,* 86 N.Y.2d 553, 635 N.Y.S.2d 116, 658 N.E.2d 989, 992 (1995).

pose of the entity claiming tribal sovereign immunity—contradict U.S. Supreme Court precedent rendering the entity's purpose and its activities irrelevant to the determination whether it qualifies for immunity. *See Kiowa*, 523 U.S. at 754–55, 118 S.Ct. 1700 (citing *Puyallup Tribe*, 433 U.S. 165, 97 S.Ct. 2616 (immunity extends to fishing, "which may well be a commercial activity"); *Potawatomi*, 498 U.S. 505, 111 S.Ct. 905 (immunity extends to suit over taxation of cigarette sales); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (immunity extends to coal-mining lease)). Consideration of the entity's purpose would function as a state-imposed limitation on tribal sovereign immunity, in contravention of federal law. *See id.* at 756, 118 S.Ct. 1700. Because the remaining factors could also function as a state-imposed limitation on tribal sovereign immunity, we disagree with the court of appeals' eleven-factor arm-of-the-tribe test.

Instead, the trial court, on remand, must determine whether Cash Advance and Preferred Cash Loans act as arms of the Miami Nation of Oklahoma and the Santee Sioux Nation, respectively, so that their activities are properly deemed to be those of the tribes. In making this determination, the trial court shall consider the following factors, each tailored to the nature of the relationship between the tribal entities and the tribes: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty.

### V. Tribal Officer Immunity

Although the issue was not presented to or briefed before it, the court of appeals addressed tribal officer immunity because of the stayed arrest warrants for the officers of the tribal entities. We address the issue because we recognize that sovereign tribes necessarily act through individual officers, thereby implicating the tribes' sovereign immunity, and because we do not want the trial court to be misled by the court of appeals' determination that tribal sovereign immunity

does not extend to tribal officers engaged in conduct allegedly violating state law.

■■■ It is undisputed that tribal sovereign immunity does not protect individual tribal members. *Puyallup Tribe*, 433 U.S. at 171–72, 97 S.Ct. 2616. However, because tribes necessarily exercise their sovereignty through the actions of individuals, tribal sovereign immunity protects tribal officers acting within the scope of their lawful authority; conversely, tribal officers may be subject to suit for declaratory or injunctive relief where they act beyond the scope of their lawful authority. *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1159–61 (9th Cir.2002), *cert. denied*, 537 U.S. 820, 123 S.Ct. 98, 154 L.Ed.2d 27 (2002); *Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Florida ("Tamiami III ")*, 177 F.3d 1212, 1225 (11th Cir.1999), *cert. denied*, 529 U.S. 1018, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000); *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir.1997); *see also Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670. The rule prevents plaintiffs from circumventing tribal sovereign immunity by simply substituting a tribal officer for the tribe. *See Dawavendewa*, 276 F.3d at 1161.

■ Given Congress' plenary authority over Indian affairs, federal law may define or limit the scope of a tribal officer's lawful authority. *See Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. 1670; *see also, e.g., Dawavendewa*, 276 F.3d at 1159–60 (tribal sovereign immunity does not bar suit against tribal officers allegedly acting in violation of federal law); *Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Florida ("Tamiami II ")*, 63 F.3d 1030, 1050–51 (11th Cir.1995) (tribal officers are not entitled to immunity where acting in violation of the federal Indian Gaming Regulatory Act, and therefore beyond the scope of lawful authority the tribe is capable of bestowing); *Tenneco Oil Co. v. Sac & Fox Tribe of Indians*, 725 F.2d 572, 574 (10th Cir.1984) (tribal officer necessarily acts beyond the scope of his authority in enforcing a tribal ordinance that violates federal law). In *Santa Clara Pueblo*, the U.S. Supreme Court extended the doctrine of *Ex parte Young*, 209

U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to a case involving an alleged violation of the federal Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1303 (2006). The Court held that the tribal officer was not entitled to immunity because, by allegedly violating federal law, the officer necessarily acted outside the scope of his lawful authority. *See Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. 1670; *see also Cohen's Handbook of Federal Indian Law* § 7.05[1][a], at 637. This holding is a simple recognition that, by enacting the Indian Civil Rights Act, Congress exercised its exclusive authority to impose particular limitations on tribal sovereignty, thereby defining the scope of lawful authority a tribe may bestow upon its officers.

The court of appeals determined that an alleged violation of state law, forming the basis of a state enforcement action, divests tribal officers otherwise acting within the scope of their lawful authority of tribal sovereign immunity. In effect, the court of appeals held that state law defines the scope of a tribal officer's lawful authority. Such a determination places a limitation on tribal sovereign immunity for which Congress has not provided, in contravention of the prohibition on state diminution of tribal sovereign immunity. *See Kiowa,* 523 U.S. at 756, 118 S.Ct. 1700; *Nat'l Farmers Union,* 471 U.S. at 852–53, 105 S.Ct. 2447.

Contrary to the court of appeals' determination, actions allegedly violating state law are not necessarily outside the scope of a tribal officer's lawful authority because that authority is defined by the sovereign tribe, not by state law. *Frazier v. Turning Stone Casino,* 254 F.Supp.2d 295, 310 (N.D.N.Y. 2003) (alleged violation of state law inadequate to demonstrate that tribal officers acted outside the scope of their lawful authority); *Bassett v. Mashantucket Pequot Museum & Research Ctr. Inc.,* 221 F.Supp.2d 271, 280–81 (D.Conn.2002) (equating an allegation that tribal officers violated state law with a claim that they acted beyond the scope of their lawful authority "would be tantamount to eliminating tribal immunity"); *but see Narragansett Indian Tribe v. Rhode Island,* 449 F.3d 16, 21 n. 3, 30 (1st Cir.2006) (en banc) (providing, in dicta, that tribal officers' violation of state cigarette tax scheme would fall outside the scope of their lawful authority where Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701–1716 (2006)—creating a "unique relationship between the Tribe and the State"—requires the tribe to comply with the scheme and subjects the tribe to state regulatory jurisdiction).

■ Accordingly, we disagree with the court of appeals' determination that tribal officers allegedly violating state law are not entitled to tribal sovereign immunity. Instead, should the trial court determine on remand that Cash Advance and Preferred Cash Loans are entitled to immunity as arms of the tribes, the appropriate determination with respect to individual tribal officers is whether they acted within the scope of their lawful authority, as defined by the tribe and limited only by federal law.

## VI. Procedure for Asserting Tribal Sovereign Immunity

■ This appeal arises in the context of the trial court's denial of the tribal entities' C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. The court of appeals determined that, at the hearing on remand, the state bears the burden of establishing by a preponderance of the evidence that subject matter jurisdiction is proper. The state asserts that the court of appeals erred in so holding because a claim of tribal sovereign immunity is an affirmative defense with its proponent bearing the burden of proof and because the civil preponderance-of-the-evidence burden of proof is inapplicable to this investigatory subpoena enforcement action. We agree with the court of appeals.

■ A claim of tribal sovereign immunity is jurisdictional in nature. *Puyallup Tribe,* 433 U.S. at 172, 97 S.Ct. 2616; *Miner Elec., Inc. v. Muscogee Nation,* 505 F.3d 1007, 1009 (10th Cir.2007); *Hagen,* 205 F.3d at 1043–44 (expressly rejecting tribal sovereign immunity as an affirmative defense); *California ex rel. Cal. Dep't of Fish & Game v. Quechan Tribe of Indians,* 595 F.2d 1153, 1154–55 (9th Cir.1979). Some courts have found it to be a question of subject matter jurisdiction. *E.g., Miner Elec.,* 505 F.3d at 1009 ("Tribal sover-

eign immunity is a matter of subject matter jurisdiction, which may be challenged by a motion to dismiss under Fed.R.Civ.P. 12(b)(1).") (citation and quotations omitted); *Fletcher,* 116 F.3d at 1319 (tribal sovereign immunity divests the courts of subject matter jurisdiction); *McClendon v. United States,* 885 F.2d 627, 629 (9th Cir.1989) (same). Others have determined that it is "a jurisdictional consideration separate from subject matter jurisdiction." *In re Prairie Island Dakota Sioux,* 21 F.3d 302, 305 (8th Cir. 1994); *see also Oglala Sioux Tribe v. C & W Enters., Inc.,* 487 F.3d 1129, 1131 n. 4 (8th Cir.2007) ("[S]overeign immunity is jurisdictional in nature but is not of the same character as subject matter jurisdiction."). We conclude that tribal sovereign immunity bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes. Consequently, the tribal entities properly raised their claim of tribal sovereign immunity in a C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.

Our determination accords with the fact that, irrespective of whether all courts find that tribal sovereign immunity is precisely a question of subject matter jurisdiction, the claim is generally raised in a rule 12(b)(1) motion, pursuant either to federal or state rules of civil procedure. *See, e.g., Kiowa,* 523 U.S. at 754, 118 S.Ct. 1700; *Miner Elec.,* 505 F.3d at 1009; *Allen,* 464 F.3d at 1046; *Garcia v. Akwesasne Hous. Auth.,* 268 F.3d 76, 84 (2d Cir.2001); *Hagen,* 205 F.3d at 1043; *Bales v. Chickasaw Nation Indus.,* 606 F.Supp.2d 1299, 1301 (D.N.M.2009); *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe,* 107 P.3d 402, 404 (Colo.App.2004). This is true even in the Eighth Circuit where the court has held that tribal sovereign immunity is a jurisdictional consideration distinct from subject matter jurisdiction. *E.g., Hagen,* 205 F.3d at 1043.

■ C.R.C.P. 12(b)(1) is identical to Fed. R.Civ.P. 12(b)(1). *Trinity Broad. of Denver, Inc. v. City of Westminster,* 848 P.2d 916, 924 (Colo.1993). Pursuant to either Fed.R.Civ.P. 12(b)(1) or C.R.C.P. 12(b)(1), the trial court must determine contested issues of fact, and the plaintiff, or non-moving party, bears the burden of proving jurisdiction. *United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1160 n. 5 (10th Cir.1999); *Trinity Broad.,* 848 P.2d at 924–25. Here, the court of appeals properly determined that the state, as the plaintiff and non-movant, bears that burden.

■ The court of appeals required that the state meet its burden of proving that the tribal entities are not entitled to immunity by a preponderance of the evidence. Preponderance of the evidence is the applicable burden of proof in civil cases. § 13–25–127(1), C.R.S. (2009). Although we have not directly addressed whether preponderance of the evidence is the proper evidentiary standard to resolve a 12(b)(1) motion, the court of appeals has so found, *Ferrel v. Colo. Dep't of Corr.,* 179 P.3d 178, 184 (Colo.App.2007), as have the federal courts, *e.g., Garcia,* 268 F.3d at 84; *Hafter D.O.,* 190 F.3d at 1160 n. 5, and other state courts, *e.g., Lawrence v. Barona Valley Ranch Resort & Casino,* 153 Cal. App.4th 1364, 64 Cal.Rptr.3d 23, 26 (2007); *Bradley v. Crow Tribe of Indians,* 315 Mont. 75, 67 P.3d 306, 311 (2003). Accordingly, we agree with the court of appeals that the state bears the burden of proving, by a preponderance of the evidence, that Cash Advance and Preferred Cash Loans are not entitled to tribal sovereign immunity.

## VII. Waiver of Tribal Sovereign Immunity

Although the trial court did not decide whether the tribal entities have waived their immunity [13] (nor the necessary predicate, whether they are entitled to immunity in the first place), the court of appeals directed the trial court, on remand, to look for waiver in a broad range of sources it deemed relevant— and therefore subject to compelled production—to a determination of waiver. These sources included tribal resolutions, lending agreements, representations made by the tribal entities to third parties, statements made to borrowers, and evidence of conduct

---

13. The state did argue in its brief to the court of appeals that the tribal entities waived their immunity via tribal charter, enabling act, and loan agreement.

in other states. In particular, the court of appeals suggested that contract terms, such as an arbitration clause, contained in agreements with Colorado consumers who are non-parties to this action may effect a waiver of tribal sovereign immunity from the state's investigatory subpoena enforcement action. We disagree with the court of appeals' direction to the trial court and caution that any waiver of tribal sovereign immunity must be explicit and unequivocal, *see Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670.

An explicit and unequivocal waiver of tribal sovereign immunity from the state's investigatory subpoena enforcement action would not be found in an arbitration clause with Colorado consumers. First, the state, which is bringing the instant action, was not a party to such agreements, and was without opportunity to request that the agreements include such a waiver. Second, the consumers, who are not parties to this action, would not have secured the inclusion of a provision in the agreements that explicitly and unequivocally confers jurisdiction over a state investigative subpoena enforcement action to Colorado courts.

In our view, the U.S. Supreme Court's decision in *C & L Enterprises* does not support the proposition that an arbitration agreement affects a wholesale waiver of tribal immunity from any suit, including one brought by the state, as a non-party to the agreement. 532 U.S. at 411, 121 S.Ct. 1589. The Court in *C & L Enterprises* simply held that an arbitration agreement—one explicitly requiring that resolution of all contract-related disputes be submitted to arbitration and that ensuing arbitration awards be reduced to judgment "in accordance with applicable law in any court having jurisdiction thereof"—effected waiver of a tribe's sovereign immunity from suit by parties to the agreement to enforce an arbitration award. *Id.* at 419–20. In other words, the tribe, via its arbitration agreement, unequivocally expressed its consent to judicial enforcement of an arbitration award. *See id.*

We also caution against the court of appeals' examples of compellable information it deemed relevant to the waiver determination. Such information is relevant only to the extent it might include an explicit and unequivocal waiver of tribal sovereign immunity from the state's investigatory subpoena enforcement action. The proper scope of compellable information with respect to the immunity determination is discussed in Section VIII, infra.

Accordingly, we disagree with the court of appeals to the extent it would recognize waiver of tribal sovereign immunity that is not explicit and unequivocal.

## VIII. Scope of Discovery Relevant to Immunity Determination

We acknowledge the disagreement between the parties with respect to whether additional discovery of information relevant to the immunity determination is necessary on remand. Although both parties recognize that some information is required for the trial court to be equipped to make the immunity determination, the tribal entities assert that their voluntary production of certain information is sufficient to make that determination, and the state asserts otherwise.

The court of appeals attempted to resolve this discovery dispute by placing upon the tribal entities an initial burden of producing a broad range of additional evidence that it deemed relevant to the immunity determination. *Cash Advance*, 205 P.3d at 409. Placing the burden of production on the tribal entities would have required them to submit "sufficient evidence to permit the trial court to determine that the Cash Advance and Preferred Cash Internet lending businesses are connected with the Tribes." *Id.* The burden of production articulated by the court of appeals may function as an impermissible limitation on tribal sovereign immunity. *See Kiowa*, 523 U.S. at 756, 118 S.Ct. 1700; *Nat'l Farmers Union*, 471 U.S. at 852–53, 105 S.Ct. 2447. Further, a court-imposed burden of production would appear to run contrary to governing federal law, as discussed in detail in Section III, supra. *See Puyallup Tribe*, 433 U.S. at 173, 97 S.Ct. 2616 (tribal sovereign immunity prevents compelled production of information to assist a state in investigating violation of and enforcing its laws); *Kiowa*, 523 U.S. at 755, 118 S.Ct. 1700; *Potawatomi*, 498 U.S. at 514, 111 S.Ct.

905; *James*, 980 F.2d at 1319; *Catskill Dev.*, 206 F.R.D. at 86. In the absence of guidance from Congress or the U.S. Supreme Court, and because the tribal entities have voluntarily produced information in this case, we decline to address the burden of production.

 Instead, we find that the tribal entities explicitly and unequivocally waived their immunity with respect to that information directly relevant to their entitlement to immunity. Over the course of proceedings, the tribal entities voluntarily provided the state with some information relevant to the immunity determination. The tribal entities' voluntary disclosure of some information functions as a limited waiver of their immunity with respect to all information. *See James*, 980 F.2d at 1320 (tribe's production of some relevant documents from a particular agency functions as a limited waiver of immunity with respect to all relevant documents from that agency). Further, it is unnecessary to consider whether the tribal entities' production could be regarded as involuntary because it may have been responsive to court mandated production of information, or to avoid court mandated production of information, because the tribal entities explicitly maintained in their briefs to this Court that they voluntarily provided the state with extensive discovery of documents relevant to the issue of whether the district court had subject matter jurisdiction. The position of the tribal entities with respect to the voluntariness of disclosure is consistent with their earlier representations. *Cash Advance*, 205 P.3d at 403. Therefore, the tribal entities have explicitly and unequivocally waived sovereign immunity for the limited purpose of determining whether the tribal entities are arms of the tribe.

Consequently, on remand, the state may request additional information relevant to the immunity determination, provided it specifies how its inquiry is tailored to fall within the limited scope of the tribal entities' waiver. After providing the tribal entities with an opportunity to respond, the trial court must determine whether the request falls within these parameters.

## IX. Conclusion

Accordingly, we affirm the judgment of the court of appeals and remand the case for a determination whether Cash Advance and Preferred Cash Loans are arms of the Miami Tribe of Oklahoma and the Santee Sioux Nation, respectively, and therefore entitled to those federally recognized tribes' sovereign immunity from this investigatory subpoena enforcement action.

Justice EID concurs in part and concurs in the judgment in part. Justice COATS concurs in part and dissents in part.

Justice EID, concurring in part and concurring in the judgment in part.

I agree with the majority's holding that tribal sovereign immunity applies to state investigatory enforcement actions as well as its adoption of a three-part test to determine whether a tribal entity acts as an arm of the tribe, and therefore join parts III and IV of the majority's opinion. I would find, however, that the tribal entities in this case have voluntarily produced sufficient information, including tribal constitutions, statutes, resolutions, correspondence, license applications, and licenses to conduct business, *see* maj. op. at 1104, 1115 (mentioning but not adopting the argument), to make the arm-of-the-tribe determination under the three-part test. Accordingly, I would remand the case to the trial court to make that determination based on the documents now in the record. Because it is not necessary to reach the additional issues addressed by the majority (and inserted into the case by the court of appeals), I concur in the judgment of the remainder of the majority's opinion.

Justice COATS, concurring in part and dissenting in part.

Although I also believe the district court erred in finding that tribal immunity cannot bar the state from judicially enforcing its investigative subpoenas, and I too would reject the eleven-factor arm-of-the-tribe test devised by the court of appeals, I find the majority's analysis no more satisfying or helpful. More fundamentally, I object to the majority's disregard for our own prior inter-

pretations of United States Supreme Court sovereign immunity doctrine, in deference to those of various inferior federal tribunals. Finally, and of perhaps greatest significance for actual practice, I believe the majority's confused jurisdictional analysis leads it to an unjustifiable and in fact illogical allocation of burdens, making it virtually impossible for the state to protect its own citizens from even the most blatant acts of fraud.

The majority's lengthy paean to tribal sovereignty notwithstanding, the Supreme Court has told us little about the scope and nature of tribal immunity, other than designating it a matter of federal law subject only to congressional limitation. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 759, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). And unlike the immunity of foreign nations, with respect to which it has legislated freely, *see* Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2891, Congress has yet to take a similarly active role in defining or regulating tribal immunity. *Kiowa,* 523 U.S. at 759, 118 S.Ct. 1700. Aside from a handful of Supreme Court pronouncements, arising largely from private disputes and state regulation of commercial activities, the incidents of tribal immunity, including the particular acts and actors to which it may apply, can be assessed only by extrapolation from general principles of sovereign immunity developed in other contexts.

There can be absolutely no question that Indian Tribes are separate "Nations," and as "sovereigns or quasi sovereigns," they enjoy immunity "from judicial attack." *Kiowa Tribe,* 523 U.S. at 757, 118 S.Ct. 1700 (quoting *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940)). The Supreme Court has therefore held that absent consent or congressional authorization, the exercise of state judicial power over an Indian Tribe, just as the exercise of state judicial power over the United States government itself, is void. *USF & G,* 309 U.S. at 514, 60 S.Ct. 653. In the absence of congressional action, it has also steadfastly declined to narrow the applicability of the judicial doctrine of tribal sovereign immunity, either by excluding commercial activities altogether or by limiting tribal immunity for commercial activities to those conducted on reservations. *Id.* at 758, 60 S.Ct. 653; *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.,* 498 U.S. 505, 510, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). Beyond suits for injunctive relief or damages, it has even upheld a tribe's immunity from state-court demands for information about its enrolled members and reports on their fishing operations. *See Puyallup Tribe, Inc. v. Wash. Dep't of Game,* 433 U.S. 165, 172, 178, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). Thus far, however, the Supreme Court has never extended tribal immunity to officers or entities facially distinct from Indian Tribes themselves.[1]

In fact, the Court has drawn a distinction between state-court orders that involve relief against a tribe itself, which must be vacated, and suits to enjoin violations of state law by individual tribal members, which are permissible, *Puyallup,* 433 U.S. at 171–73, 97 S.Ct. 2616, making clear that tribal immunity does not immunize individual tribal members as such, even if they are officers of the tribe. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Puyallup,* 433 U.S. at 171, 97 S.Ct. 2616. Pointedly explaining why permitting a state to require Indian retailers to collect a state-imposed cigarette tax from nonmembers of the tribe would not amount to providing a right without a remedy, the Supreme Court

---

1. To the extent the majority suggests otherwise, I cannot agree that the Supreme Court has even implicitly addressed the arm-of-the-tribe question. *See* Maj. op. at 1109. The Supreme Court's only arm-of-the-tribe reference appears in the footnote cited by the majority, *see Inyo County v. Paiute–Shoshone Indians,* 538 U.S. 701, 705 n. 1, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003), and that footnote does no more than acknowledge the undisputed assertion of the Solicitor General, appearing as amicus curiae, that

the Tribe's gaming corporation should be treated as an arm of the tribe, which would of course subject it to the Tribe's same inability to bring suit against the county. Because the Supreme Court disposed of the case by holding that a plaintiff could not simultaneously claim to be a "person," entitled to sue under 42 U.S.C. § 1983, and a "sovereign," whose immunity was violated by execution of the County's search warrant, the questions whether the Tribe's immunity was actually violated and whether the Tribe's gaming corporation shared that immunity were never at

held in *Potawatomi* that "individual agents or officers of a tribe" remain liable for damages in actions brought by the State, despite their tribe's enjoyment of sovereign immunity. 498 U.S. at 514, 111 S.Ct. 905.

Sovereign immunity is generally held to extend to particular persons or entities named in a law suit only to the extent that the suit is, in effect, a suit against the sovereign. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Middleton v. Hartman,* 45 P.3d 721, 727 (Colo.2002). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Pennhurst,* 465 U.S. at 102 n. 11, 104 S.Ct. 900 (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)). It is this judicially promulgated body of sovereign immunity principles, rather than any congressional or Supreme Court treatment of Indian Tribes in particular, that has led to the widespread acceptance by both state and lower federal courts that tribal immunity, as a species of sovereign immunity generally, extends to state judicial orders that would operate, in fact even if not in name, against a sovereign tribe. *Compare Allen v. Gold Country Casino,* 464 F.3d 1044, 1047 (9th Cir.2006) (holding that a casino that "function[ed] as an arm of the Tribe" enjoyed tribal immunity), *and Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation,* 673 F.2d 315, 320 (10th Cir.1982) (holding that an inn which was "a sub-entity of the Tribe rather than a separate corporate entity" enjoyed tribal im-

munity), *and Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.,* 207 F.3d 21, 29 (1st Cir.2000) (holding that as an arm of a tribe, an entity enjoys the full extent of the tribe's sovereign immunity), *and Hagen v. Sisseton–Wahpeton Cmty. Coll.,* 205 F.3d 1040, 1043 (8th Cir.2000) ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."), *with Samantar v. Yousuf,* — U.S. ——, 130 S.Ct. 2278, 2289–92, 176 L.Ed.2d 1047 (2010) (finding that in contradistinction to general principles of sovereign immunity, FSIA extends *foreign sovereign immunity* only to statutorily defined agencies and instrumentalities and not to foreign officials at all).

These principles, including the proposition that an agent or entity facially distinct from a sovereign may nevertheless be entitled to sovereign immunity when it acts as an "arm" of the sovereign, have been developed by the Supreme Court largely in the context of the Eleventh Amendment.[2] It is well settled that the Eleventh Amendment's reference to actions "against one of the United States" encompasses not only actions in which a state is actually named as a defendant but also certain actions against state agents and state instrumentalities. *Doe,* 519 U.S. at 429, 117 S.Ct. 900. And although it has emphasized that Indian Tribes have not consensually accepted the same limitations on their sovereignty as those accepted by the states in ratifying the federal constitution, *see Blatchford v. Native Vill. of Noatak,* 501 U.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), the Court has never suggested an Eleventh Amendment limitation that might more severely restrict the class of facially distinct agents or entities to which a sovereign's immunity could extend.[3]

issue in this section 1983 action and were never addressed.

2. While entities may be agencies or instrumentalities of the federal government as well, disputes over their status have more typically involved the interpretation of "sue or be sued" language in their enabling legislation, *see, e.g., FDIC v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Keifer & Keifer v. Reconstruction Fin. Corp.,* 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939), or the question whether they are agencies or instrumentalities of the United States for the

purpose of individual rights guaranteed against the Government by the Constitution. *See Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995).

3. The majority protests that Supreme Court jurisprudence "requires" it to distinguish tribal from state sovereign immunity and suggests that looking to arm-of-the-state jurisprudence would "diminish" the "inherent nature of tribal sovereignty." Maj. op. at 1110 n. 11. Apart from indicating that tribal sovereign immunity is not coextensive with that of the States, the Supreme Court has never suggested any difference that

With varying degrees of specificity, the federal courts upon which the majority relies have looked to their own arm-of-the-state jurisprudence to fashion an arm-of-the-tribe doctrine. While the Supreme Court's arm-of-the-state jurisprudence had clearly required a balancing of various factors, its reference to different factors in different cases and its failure to specify the relative importance of any particular factor, however, had led the federal circuits to develop what we have previously described as a "diverse array" of arm-of-the-state balancing tests. *See Simon v. State Comp. Ins. Auth.*, 946 P.2d 1298, 1303 (Colo.1997). With no different guidance from the Supreme Court concerning the immunity of tribal agents or instrumentalities, the arm-of-the-tribe balancing tests of the federal circuit courts have similarly lacked uniformity.

While this court has not until today had occasion to tailor an arm-of-the-sovereign inquiry specifically to tribal immunity, we have previously found it necessary to digest these balancing tests and identify what we consider to be the dominant factors in determining whether an entity acts an arm of the sovereign. *See id.* at 1305 (applying Eleventh Amendment immunity analysis to determine whether state-created entity is a person for purposes of 28 U.S.C. § 1983). In *Simon* we described the appropriate considerations as: 1) how state law characterizes the entity; 2) whether the entity is autonomous and free from the control of the state; and 3) whether the judgment against the entity would ultimately be paid by the state. *Id.* Although we there took into consideration the understanding of other state and federal courts, we declined to abdicate our responsibility to construe for ourselves the federal law to which the courts of this state would be subject.

The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a federal court's interpretation other than that of the United States Supreme Court. *Hill v. Thomas*, 973 P.2d 1246, 1255 (Colo.1999) (quoting *Community Hosp. v. Fail*, 969 P.2d 667, 672 (Colo.1998), and paraphrasing *Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring)). This court's interpretation of federal law is no less authoritative than that of the Circuit Court of Appeals for this federal circuit, much less the interpretations of other federal courts. *See id.* If we follow the interpretations of inferior federal tribunals, it is because we choose to do so and not because we must. *Id.*

While the majority declares various lower federal court cases to be persuasive, it offers no supporting explanation why this might be so, much less why they would be more persuasive than our own precedents. Without distinguishing or overruling our own prior interpretations of Supreme Court arm-of-the-sovereign doctrine, the majority simply fails to follow them. Perhaps even more objectionably, it openly criticizes the interpretation of federal law by state courts, fearing that it may be interpreted as an improper state-imposed limitation or diminution of federal rights. Unlike the majority, I consider our construction of federal law, until it has been overruled or modified by either this court or the United States Supreme Court, to be the binding precedent of the jurisdiction.[4]

Although the majority's three-factor test, for which it credits the federal courts of appeal, is strikingly similar to our three-part arm-of-the-state test, its disparate terminology and derivation leave it virtually unconnected to the established arm-of-the-sovereign jurisprudence of both this court and the Supreme Court. In sharp contrast, by rejecting the "diverse array" of federal circuit court arm-of-the-state balancing tests and

---

might affect the determination whether a suit brought against another person or entity is in fact a suit against the sovereign, and the majority offers none.

4. Subsequent to our articulation of a three-part test in *Simon*, the United States Supreme Court broadened the focus on the importance of pro-

tecting the public fisc by holding that "[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *See Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002).

basing our own analysis in that context on first principles articulated by the United States Supreme Court, this court has already provided the framework for extending tribal sovereign immunity to facially distinct agents or entities. And by applying the Supreme Court's Eleventh Amendment arm-of-the-sovereign doctrine in specific factual settings, I believe we had already created relevant binding precedent for the jurisdiction, now derailed by the majority's freshly imported standard.

Apropos of these specific motions to dismiss, alleging merely that Cash Advance and Preferred Cash Loans are business names for entities that are licensed and regulated by, and incorporated under the laws of, sovereign Indian Tribes, this court has previously made clear that classification as an arm of a sovereign necessarily requires a balance of all three relevant factors. Being licensed or regulated by a sovereign is, in itself, clearly insufficient. Our arm-of-the-sovereign jurisprudence has therefore looked to the extent to which the sovereign exercises financial and administrative control over the entity as a means of assessing whether it is simply too autonomous and free of state control to actually function as the state. *See Simon,* 946 P.2d at 1308–09; *Graham,* 956 P.2d at 563–64. In that regard, we have found, for instance, that a sovereign's choice to characterize an entity as a body corporate or political subdivision, rather than an agency of the sovereign, actually militates against a determination that the entity is authorized to function as the sovereign and share its immunity. *See Simon,* 946 P.2d at 1305; *cf. Graham,* 956 P.2d at 563 (holding, however, that where special reasons existed for designating the University of Northern Colorado a body corporate, other grounds for finding it an arm of the state were more influential).

Although the majority professes caution, it actually throws caution to the winds and steams full speed ahead into uncharted waters. Not only does it coin a new arm-of-the-tribe doctrine, but after conceding that the issue has not been raised or briefed in this enforcement action against two commercial entities, the majority proceeds to opine on the extent to which tribal immunity should extend to officials of those entities. Even assuming that tribal officials, just as state officials, enjoy sovereign immunity in suits that are nominally against them but are in fact against their sovereign, no official of these commercial entities is currently the object of the state's investigative subpoenas or any court enforcement order in this case. In the unlikely event that on remand the district court finds Cash Advance and Preferred Cash Loans, the named commercial entities, to actually fall under a cloak of tribal immunity, and it nevertheless orders enforcement against their officers (despite not having been named as parties to the action), only then would this issue become ripe for resolution.

Conceptually faulty as I believe the majority's arm-of-the-tribe analysis to be, I fear the more serious negative consequences of today's opinion may lie in its allocation of burdens. The majority requires that before a state can exercise jurisdiction over an entity claiming to operate as an arm of a tribe, the state must disprove that claim. As a practical matter, this burden will be extremely difficult if not impossible for the state to ever meet. Because I believe the majority has failed to appreciate precisely what is at issue in an arm-of-the-sovereign determination, I believe it mis-analyzes the question of jurisdiction and therefore the allocation of burdens.

Although it is forced by the federal cases upon which it relies to concede that a party's claim of tribal immunity does not actually present a question of subject-matter jurisdiction, the majority nevertheless finds it sufficiently similar to be treated as such. Unlike claims of governmental immunity in this state, which by statute must be resolved by a procedure similar to but without the jurisdictional limitations of C.R.C.P. 12(b)(1), *see Finnie v. Jefferson County Sch. Dist. R–1,* 79 P.3d 1253, 1255–60 (Colo.2003), neither Congress nor the Supreme Court has remotely suggested such a procedure for resolving claims of tribal immunity. In any event, however, the majority fails to appreciate that an arm-of-the-tribe defense does not question whether a sovereign Indian Tribe is immune from suit but only whether the party subject-

ed to judicial enforcement is really an instrumentality of the tribe.

In the absence of a state judicial proceeding nominally seeking relief against an Indian Tribe, exercise of the state's judicial power over a named party is neither logically nor legally contingent upon tribal consent or the waiver of tribal immunity. Rather, it is incumbent upon any nominally distinct entity claiming the cloak of tribal immunity to initially establish that the state's suit against it actually seeks relief against an Indian Tribe on behalf of which it acts. The logical absurdity of requiring the state to prove that named commercial enterprises like Cash Advance and Preferred Cash Loans, with no apparent connection to Indian Tribes and only belated claims of one, are not acting on behalf of particular Indian Tribes should be obvious. For this reason, and because fairness generally mandates that the burden of proving issues lying peculiarly within the knowledge of one party should be borne by it, federal circuit courts considering the question unanimously conclude that an entity asserting Eleventh Amendment immunity has the burden to demonstrate its entitlement. *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d Cir.2006). Not surprisingly, this procedural approach has been similarly applied to assertions of tribal immunity. *E.g., New York v. Shinnecock Indian Nation,* 523 F.Supp.2d 185, 297 n. 72 (E.D.N.Y.2007).

The majority of course recognizes the practical dilemma created by its jurisdictional analysis and attempts to avoid the problem of producing the necessary information, at least in this case, by finding that the "tribal entities" have already "voluntarily provided the state with some information relevant to the immunity determination" and have thereby waived any claim of immunity with regard not only to that information but to all information concerning "whether the tribal entities are arms of the tribe." Maj. op. at 1115.

It is more than a little unclear to me how negotiated disclosures in the face of official process demanding production and threatening contempt can be characterized as a voluntary waiver of all information relevant to the immunity determination, but in any event, it is cold comfort for the state in future cases where the object of the state's investigative subpoenas can be virtually certain that it need not provide any information until the state has disproved its claim to be an arm of a tribe.[5]

While Indian Tribes are clearly independent sovereign powers entitled to immunity from enforcement actions by the state or federal courts, I believe the duty of state governments to protect vulnerable consumers from criminally unscrupulous predators, especially in the current technological environment, militates against the expansion of that immunity beyond existing mandates of federal law. We are here faced with an immediate appeal from the district court's denial of a motion to dismiss a special proceeding to enforce administrative subpoenas. Assuming that appeal was properly taken at this stage of the proceedings, I believe our duty would be more judiciously discharged simply by identifying the district court's clear error in finding tribal immunity inapplicable to state demands for information; by rejecting the expansive holding of the court of appeals; and by remanding for a determination whether the named commercial entities are arms of a sovereign according to our existing interpretations of United States Supreme Court doctrine. But for the majority's penchant for global solutions and the problems created by its own questionable choices, I see no need for the court to expound on such matters as the immunity of tribal officials, whether tribal immunity operates as a matter of jurisdiction or as an affirmative defense, or the requirements for waiver of tribal immunity, none of which

---

**5.** I (as I am sure will any lower court reading the majority opinion) consider completely illusory the suggestion that a separate burden-of-production question remains undecided. The majority expressly places on the state the burden of proving the entities are not arms of the tribe; strikes down the court of appeals' attempt to separate the burden of persuasion from the burden of production; and openly opines that requiring an entity claiming to be an arm of a tribe to produce any information relative to its claim may amount to an impermissible limitation on tribal sovereign immunity.

were addressed by the district court's order being appealed here.

Because I would also remand to the district court and reject the guidance of the court of appeals, but would reject the majority's guidance for proceedings on remand as well, I respectfully concur in part and dissent in part.

